United States Court of Appeals
Fifth Circuit

**F I L E D**

**June 27, 2003**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

———————————

No. 01-50736

———————————

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

FIDENCIO SANCHEZ-PENA,

Defendant-Appellant.

———————————

Appeal from the United States District Court
For the Western District of Texas

———————————

Before GARWOOD and HIGGINBOTHAM, Circuit Judges, and FELDMAN, District Judge.[*]

PATRICK E. HIGGINBOTHAM, Circuit Judge:

A jury convicted appellant Fidencio Sanchez-Pena ("Sanchez") of aiding and abetting possession with intent to distribute marijuana, for which he received a sentence of forty-one months' imprisonment and three years' supervised release. Prior to trial, the district court denied Sanchez's motion to suppress the drug evidence police officers found in his car following a traffic stop.

———————————

[*] District Judge of the Eastern District of Louisiana, sitting by designation.

Sanchez appeals the trial court's ruling on that motion, and also asserts that one of his attorneys labored under a conflict of interest during Sanchez's trial and pretrial proceedings and that the other rendered ineffective assistance of counsel. Finding no error, we affirm.

## I.

There was testimony at the hearing on the motion to suppress that on October 19, 2000, at approximately 4 a.m., Brewster County Deputy Sheriff Ross Bates, while patrolling in a southerly direction on U.S. Highway 385, observed a blue Suburban traveling north, partially on the shoulder of the road, at a speed of forty-nine miles per hour. The posted speed limit was sixty-five miles per hour. Bates testified that he had learned during DWI training that there is a fifty-percent chance that a driver going more than ten miles below the speed limit is intoxicated; driving on the shoulder of the road also indicates that the driver is under the influence.

Based on his suspicion that the driver was intoxicated, Bates turned his vehicle in a northerly direction and activated his overhead lights to stop the Suburban. The driver of the Suburban turned on his left turn signal but pulled over to the right of the roadway. Bates then exited his patrol car and the driver, whom Bates identified as Sanchez, also exited his vehicle and met the officer at the front of the police car.

Bates did not notice the smell of alcohol on Sanchez's breath, but saw that Sanchez appeared nervous and his hands and knees were shaking. The two spoke in English without any apparent problems, and Sanchez presented a valid Texas driver's license. Sanchez told Bates that he was coming from Presidio, Texas, and going to Del Rio, Texas. That raised further questions, because Sanchez was not taking the logical route to reach his destination, choosing to navigate the hilly, winding road through Big Bend National Park instead of using a more direct, faster highway route.

Bates asked for proof of insurance, and Sanchez told Bates to wait by the patrol car while he obtained it from the Suburban. However, Bates followed Sanchez to his car, and noticed when Sanchez reached across the driver's seat to retrieve the insurance card from the glove box that there was a passenger in the front seat, whom Bates identified as Sanchez's co-defendant, Cazares. Sanchez conversed with Cazares in Spanish and then obtained the insurance paper from the glove compartment. When Sanchez turned and found Bates behind him, "he kind of jumped a little." Bates asked Sanchez to wait while he checked the vehicle's registration and for outstanding warrants.

After Bates returned to his vehicle, he received a call from Border Patrol Agent Tashman advising him about oncoming traffic. Bates told Tashman that he had stopped a blue Suburban and that he would probably need assistance. Bates, who had a drug-detecting dog with him, determined that a canine inspection should be

-3-

conducted on the vehicle based on its suspicious route and because similar vehicles had been used to smuggle drugs in the gas tank. However, because there were two individuals in the car, he hesitated to conduct the canine inspection in the dark isolated area without any assistance.

Bates received information that Sanchez was the registered owner of the vehicle. He returned to Sanchez's vehicle and noticed that the heater was on high, which he found odd since he was in short sleeves on that October night. Bates advised Sanchez that he wished to conduct a canine inspection and asked Sanchez if he would mind proceeding with him to a closed checkpoint approximately thirty miles north; Sanchez said that was fine.

Bates followed Sanchez's vehicle and called a dispatcher to obtain the assistance of another officer, Deputy Fuentes, at the checkpoint, because Agent Tashman was located too far away to get to the checkpoint by the time Bates and Sanchez were due to arrive. Just before reaching the checkpoint, Sanchez pulled over to the right of the roadway, and Bates pulled in behind him and turned on his overhead lights for safety reasons. He told Sanchez to pull up to the lit area of the checkpoint, which was 200 to 300 yards away, and Sanchez did so without any protest. Deputy Fuentes was at the checkpoint when they arrived, and Sanchez began speaking to him in Spanish. Bates spoke to Sanchez through Fuentes and told Sanchez that he wanted to perform a canine inspection on the vehicle. Sanchez again consented to the inspection.

-4-

Bates testified that he and the dog, Pepper, circled the vehicle and the dog alerted to the gas tank area of the Suburban. He then inspected the inside of the vehicle and noticed that the floor boards from front to back were soaking wet. Sanchez explained that a relative had washed the car and might have left a door open.

Agent Tashman arrived and used a scope to examine the gas tank, which revealed an abnormal tank in which there appeared to be some welding and a black colored box. Based on that observation, the dog alert, the time of night, the route being taken, and the type of vehicle, Bates decided to arrest Sanchez and Cazares. The officers proceeded to the Border Patrol Station, removed the gas tank, and found two large metal containers inside of it. The containers concealed approximately 195 pounds of marijuana.

Sanchez and Cazares told a different story at the hearing. Cazares denied that the car was weaving, but admitted that when Bates initially stopped them, he said the vehicle had been zigzagging on the road and traveling very slowly and he suspected the driver had been drinking. Cazares asserted that after Bates inspected the insurance papers, he told them to drive safely and gave them permission to leave. He did not hear Bates discussing a canine inspection or making an additional stop, but admitted that he could not hear all of the conversation between Bates and Sanchez. He testified that they continued to drive north but as they approached the checkpoint, Bates came up behind them and

turned his lights on. Sanchez stopped about a half block from the checkpoint, and Bates told them to proceed to the checkpoint; when they arrived at the checkpoint, Fuentes told them to stand there and not move. Cazares did not hear Fuentes ask for consent to do a canine inspection and did not recall Sanchez consenting to the canine inspection or to the gas tank being scoped with an instrument. He testified that he and Sanchez were not told at any point that they were free to leave the checkpoint and he did not feel that he was free to walk away.

Sanchez testified that, at the time of the initial stop, Bates told him he could leave after his paperwork was found to be in order. He noticed after driving away that Bates continued to follow his vehicle. As they approached the checkpoint, Bates put on his overhead lights, and Sanchez felt compelled to stop. He denied that Bates asked him to drive to the checkpoint so that he could conduct a canine inspection. However, he acknowledged that Deputy Fuentes asked for permission to conduct the canine inspection, and he consented to it because he did not feel that he had the right to say no.

At the conclusion of the hearing, the district court determined that Officer Bates had the right to stop Sanchez because he was driving slowly and weaving and, thus, Bates had a reasonable basis to suspect that he was intoxicated. The district court made the credibility determination that Sanchez consented to the request to proceed to the checkpoint for a canine inspection. The district

-6-

court also determined that the consent was voluntary, that the canine had sufficient training to make an effective alert, and that the canine inspection presented no Fourth Amendment problems. With these findings the trial court denied Sanchez's motion to suppress.

## II.

Sanchez urges here that Bates had no reasonable suspicion of illegality justifying the initial traffic stop; that, even if reasonable suspicion did justify the initial stop, the officers located the evidence after they had illegally extended the stop past the original justification; and that the drug-detection dog was not qualified to detect narcotics. In reviewing a district court's order denying a motion to suppress, we review conclusions of law *de novo* and factual findings for clear error, viewing the evidence in the light most favorable to the party who prevailed in the district court, in this case the Government.[1]

## A.

Sanchez first contends that the initial traffic stop was not based on Officer Bates's reasonable suspicion that Sanchez was driving while intoxicated.[2] The Government retorts that the manner

---

[1] *United States v. Jordan*, 232 F.3d 447, 448 (5th Cir. 2000).

[2] Sanchez actually argues that Officer Bates did not have probable cause to effect the stop, but reasonable suspicion, not probable cause, was all that was required to stop Sanchez's vehicle. *United States v. Shaw*, 701 F.2d 367, 377 n.4 (5th Cir. 1983) ("We note that the initial stop of Shaw's truck did not have to be justified by 'probable cause,' but only that the officers must have had reasonable grounds to suspect that the vehicle [was

-7-

in which Sanchez was driving the vehicle provided an objective basis for a reasonable suspicion and that the district court found credible Bates's testimony about his belief that the driver might be intoxicated.

The Fourth Amendment prohibition against unreasonable searches and seizures extends to stopping a vehicle and temporarily detaining its occupants.[3] Even so, the Fourth Amendment is not "a guarantee against *all* searches and seizures, but only against *unreasonable* searches and seizures."[4] We analyze traffic stops under the standards announced for investigative detention in *Terry v. Ohio*.[5] Under *Terry*, whether a traffic stop complies with the Fourth Amendment depends upon two factors: whether the stop was justified at its inception and whether the Fourth Amendment intrusions were reasonably related in scope to the circumstance that justified the interference in the first place.[6] The officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion.[7] However, the constitutional

---

involved in criminal activity].").

[3] *United States v. Shabazz*, 993 F.2d 431, 434 (5th Cir. 1993).

[4] *United States v. Sharpe*, 470 U.S. 675, 682 (1985).

[5] 392 U.S. 1 (1968).

[6] *United States v. Crain*, 33 F.3d 480, 485 (5th Cir. 1994).

[7] *Terry*, 392 U.S. at 21.

reasonableness of the stop does not depend upon the actual motivations of the officer involved.[8]  An officer may stop a motorist for a traffic violation even if, subjectively, the officer's true motive is to investigate unrelated criminal offenses.[9]

The district court found credible Officer Bates's testimony that the low speed at which Sanchez was driving, sixteen miles under the speed limit, coupled with the vehicle's encroachment onto the shoulder of the lane, raised a reasonable suspicion in his mind as to Sanchez's sobriety.  Sanchez argues that Officer Bates should not have found it unusual that Sanchez was traveling at forty-nine miles per hour on that stretch of highway because only five miles prior to being stopped Sanchez had exited Big Bend National Park, which has a posted speed limit of forty-five.  Although this ultimately may have been the reason for Sanchez's slow speed, it is insufficient to show that Officer Bates lacked a reasonable suspicion that Sanchez was intoxicated, given that in his experience, when a vehicle is traveling at a speed substantially below the speed limit *and* is failing to stay within its lane, the driver is likely intoxicated.

"A 'trained officer draws inferences and makes deductions ... that might well elude an untrained person,' and evidence collected

_____

[8] *Whren v. United States*, 517 U.S. 806, 813 (1996).

[9] *Id.* at 812-13.

'must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.'"[10]  We traditionally give due deference to the experience of officers such as Deputy Bates in identifying a number of factors that, although insufficient by themselves to suggest illegal activity, taken together are indicia of certain types of illicit acts.[11]  For example, in *United States v. Muniz-Melchor*,[12] we concluded that although "no one of [the officer's] observations with respect to Muniz-Melchor's truck and its contents or Muniz-Melchor's answers to [the officer's] queries would constitute probable cause to search the truck and its tank,"

> [a] succession of otherwise 'innocent' circumstances or events ... may constitute probable cause when viewed as a whole.  We do not consider the several factors in isolation, but rather in their interrelated context, where each may reinforce the other, so that the laminated total may indeed be greater than the sum of its parts.[13]

Necessarily incorporated into this analysis is the officer's "training and prior experience," viewed in a light most favorable

---

[10] *United States v. Reed*, 882 F.2d 147, 149 (5th Cir. 1989) (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981)).

[11] *See, e.g.*, *United States v. Muniz-Melchor*, 894 F.2d 1430, 1438 (5th Cir. 1990); *Reed*, 882 F.2d at 149 (explaining that the border patrol agent "observed several factors that in his experience led him to believe that criminal activity was underfoot," and finding that together they justified the Fourth Amendment intrusion).

[12] *Muniz-Melchor*, 894 F.2d at 1438.

[13] *Id.*

to the government.[14]  Applying that instruction here, we conclude that, based on his experience, Officer Bates had a reasonable basis to suspect that Sanchez was driving under the influence in violation of Texas law, because Sanchez was both veering from his lane and driving substantially below the posted speed limit.[15]

**B.**

Sanchez's second argument is two-part: He first contends that the evidence at the suppression hearing showed that the occurrences at the checkpoint were distinct from the first stop, and that

---

[14] *Id.*

[15] *See* TEX. PENAL CODE ANN. § 49.04 (Vernon 2002).  In a substantially similar case, the Tenth Circuit found that an officer had a reasonable basis to suspect that the driver was intoxicated. *See United States v. Botero-Ospina*, 71 F.3d 783, 788 (10th Cir. 1995).  That court explained:

> At the suppression hearing, Deputy Barney testified ... that Mr. Botero-Ospina's vehicle was traveling well below the posted speed limit and straddling the lane as it traveled eastbound on Interstate 70.  Additionally, Deputy Barney testified that, based upon his observation of the vehicle and his experience with motorists traveling down that stretch of road, he believed the driver may have been impaired or falling asleep.  The magistrate judge found that Mr. Botero-Ospina's vehicle was generally being operated in violation of Utah law.
>     ... Deputy Barney's stop of Mr. Botero-Ospina's vehicle was proper.... [H]e was able to articulate specific facts which, in light of his training and experience, gave rise to a reasonable suspicion that Mr. Botero-Ospina may have been driving under the influence of alcohol ... Deputy Barney was fully warranted in stopping Mr. Botero-Ospina.... It is ... irrelevant that Deputy Barney may have harbored a secret hope of finding evidence of drug trafficking.

*Id.* (citations omitted).

Officer Bates did not have reasonable suspicion to pull over Sanchez at the checkpoint. Additionally, Sanchez contends that even if the district court did not clearly err in viewing the interaction at the checkpoint as a continuation of the first traffic stop, the extension of Sanchez's stop past the point at which the justification for the initial traffic stop ended constituted an illegal seizure.

The district court concluded, after hearing the evidence presented, that the interaction at the checkpoint was not a second stop for which the officers needed reasonable suspicion. It based this conclusion on its factual finding that during the first stop, Bates asked if Sanchez would proceed to the checkpoint, and Sanchez consented. Viewing the evidence in the light most favorable to the Government, we find that testimony at the hearing supports the district court's finding. According to Bates, after conclusion of the initial traffic stop Sanchez agreed to proceed to the checkpoint and voluntarily pulled over shortly before reaching the checkpoint. He then consented to Bates's request to pull up all the way to the checkpoint and to allow the officers to run the dog around the car. Given this testimony we cannot conclude that the district court clearly erred in determining that the occurrences at the checkpoint were a continuation of the first stop instead of a separate stop.

Sanchez also asserts that Officer Bates's request that Sanchez drive to the checkpoint for the canine inspection unlawfully

extended the initial traffic stop under *United States v. Dortch*,[16] *United States v. Jones*,[17] and *United States v. Santiago*.[18]    In *Dortch*, two highway patrol officers stopped the defendant, who was driving a rental car, for traveling too close to a tractor-trailer.[19]   Dortch handed over his license and the rental car papers, and one of the officers ran a computer check for warrants and attempted to determine whether the car was stolen.[20]   The officers told Dortch that he would be free to leave after they completed the warrants check, but that they had to detain his car until they had performed an exterior canine search of it.[21]   Twenty minutes later, the canine unit arrived and completed an exterior dog sniff of the vehicle.[22]   The dog alerted to the driver's side door and seat, but a subsequent search of the car uncovered no contraband.   However, the officers patted down Dortch and found drugs on his person.[23]

Dortch moved to suppress the drug evidence on the basis that

---

[16] 199 F.3d 193 (5th Cir. 1999).

[17] 234 F.3d 234 (5th Cir. 2000).

[18] 310 F.3d 336 (5th Cir. 2002).

[19] 199 F.3d at 195.

[20] *Id.* at 195-96.

[21] *Id.* at 196.

[22] *Id.*

[23] *Id.*

the officers had unlawfully detained him by forcing him to wait for them to conduct the canine search.[24] We agreed, because it could not be said that Dortch felt free to leave after the officers informed him that the computer check was completed since they also told him that they were going to detain his car until completion of the dog sniff.[25] The officers harbored no reasonable suspicion that Dortch was trafficking drugs, so "Dortch should have been free to leave in his car" after completion of the computer check; "[o]nce he was not permitted to drive away, the extended detention became an unreasonable seizure."[26]

Similarly, in *Jones*, we found an unlawful detention after officers stopped the two defendants for speeding.[27] The officers completed criminal history and driver's license checks, but then continued to question the defendants on their destination and what line of business the travelers were in, as well as inquiring if there were any narcotics in the car.[28] The driver denied that the vehicle contained drugs, and the officers asked for and received

---

[24] *Id.* at 198 ("The thrust of Dortch's appeal is that ... at some point the detention became unreasonable and exceeded the scope of intrusion allowed under *Terry*.").

[25] *Id.*

[26] *Id.* at 198-203.

[27] 234 F.3d 234, 237-44 (5th Cir. 2000).

[28] *Id.* at 237-38.

oral consent to search the vehicle.[29]  During the search they found drugs in the trunk.[30]

The defendants moved to suppress the evidence, arguing that "the officers' continued detention after the completion of the computer check was unreasonable under the circumstances and exceeded the scope of the initial stop."[31]  We found the defendants' argument meritorious, reasoning:

> The basis for the stop was essentially completed when the dispatcher notified the officer about the defendants' clean records, three minutes before the officers sought consent to search the vehicle.  Accordingly, the officers should have ended the detention and allowed the defendants to leave.... [T]he failure to release the defendants violated the Fourth Amendment.[32]

Finally, in *Santiago* the court reversed the trial court's denial of the defendant's motion to suppress because officers discovered the drug evidence at issue after they had fulfilled the purpose of their original stop, which was to determine whether an object hanging from the rearview mirror of the defendants' car posed a risk to oncoming traffic because of its shininess.[33]  In so holding we reviewed established case law on the issue of prolonged stops:

---

[29] *Id.*

[30] *Id.*

[31] *Id.* at 239.

[32] *Id.* at 241.

[33] 310 F.3d 336, 377-43 (5th Cir. 2002).

-15-

[A] Fourth Amendment violation occurs when the detention extends beyond the valid reason for the stop. Once a computer check is completed and the officer either issues a citation or determines that no citation should be issued, the detention should end and the driver should be free to leave. In order to continue a detention after such a point, the officer must have a reasonable suspicion supported by articulable facts that a crime has been or is being committed.[34]

The Government argues that *Jones*, *Dortch*, and *Santiago* do not apply to this case because the officers' interaction with Sanchez after the computer check was a consensual encounter, as opposed to a detention. It points out that in *Jones*, the officers kept one of the defendants in the back of their patrol car and held his driver's license and the warning citation until after that defendant consented to a search of the car.[35] In *Dortch*, although the officers told the defendant he was free to leave after the completion of the initial traffic stop, they refused to allow him to take his car until after they completed the canine inspection.[36] In *Santiago*, after the officer completed the computer checks he insinuated that the defendant was carrying contraband in his car before asking to perform a search of the vehicle.[37] The Government

---

[34] *Id.* at 341-42 (citations omitted).

[35] *United States v. Jones*, 234 F.3d 234, 237-38 (5th Cir. 2000).

[36] *United States v. Dortch*, 199 F.3d 193, 202 (5th Cir. 1999).

[37] *Santiago*, 310 F.3d at 339 ("Trooper Raley told Santiago that he should remove the object from his mirror before leaving, but before he let Santiago go, he told Santiago that a lot of illegal contraband was being smuggled down the interstate highways.

contends that, unlike in these cases, Officer Bates did not interrogate Sanchez after the computer checks had been returned or suggest that he was suspicious that Sanchez was trafficking drugs. Additionally, Bates did not retain Sanchez's driver's license or insurance documentation after completion of the traffic stop or while they traveled to the checkpoint.[38]

---

Trooper Raley noted that Santiago was from Santa Ana, which was relatively near the border and which he knew to be a major source of methamphetamine, and also noted that Santiago's destination, Atlanta, was known to be a major distribution point of narcotics. Trooper Raley then asked Santiago whether he had any illegal contraband on his person or in the vehicle. Santiago stated that he did not, and Raley asked Santiago if he minded whether he searched the vehicle to make sure. Santiago stated that he did not mind.").

[38] The Government contends that this case is more akin to *United States v. Gonzales* than to *Jones*, *Dortch*, or *Santiago*. *See United States v. Gonzales*, 79 F.3d 413 (5th Cir. 1996). In *Gonzales*, we found that two defendants, Muniz and Gonzales, had participated in what was at least initially a consensual encounter with DEA agents. *Id.* at 421. Agents had been surveilling them because of their association with a government target suspected for possible drug activity. *Id.* at 416-18. The agents approached Muniz at a car dealership and Gonzales at a hotel. *Id.* In both circumstances the agents identified themselves and requested identification from the defendants. *Id.* The agents who were with Muniz asked and received permission to pat Muniz down for weapons, and suggested that Muniz accompany them to the hotel at which Gonzales was waiting with the other agents. *Id.* Muniz voluntarily consented to go with them to the hotel. At the hotel, the agents asked Muniz to sit in a grassy area near his car, which he did. *Id.* The agents then discovered that Muniz's car was rented by Gonzales and asked if they could search Muniz for the key. Muniz assented, and they found the key in Muniz's sock. *Id.* Gonzales consented for the agents to search the trunk. Before the search could commence, a police canine unit arrived and the dog alerted to the trunk of the car. *Id.*
   Muniz and Gonzales argued that the key and drug evidence found in the car should have been suppressed because the agents located the evidence after they had illegally detained the defendants.

The Government urges that Officer Bates's interaction with Sanchez after satisfaction of the purpose for the initial traffic stop was allowable if consensual. The Supreme Court has explained that "a seizure does not occur simply because a police officer approaches an individual and asks a few questions"; asking questions is not itself a detention.[39] So long as "a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter," it is consensual.[40] This test is objective and "presupposes an *innocent* person."[41] Because such encounters are voluntary, they do not implicate Fourth Amendment protections such as the requirement of reasonable suspicion.[42]

In *Ohio v. Robinette* the Supreme Court recognized the possibility of a consensual search following a lawful traffic stop.[43] In that case a police officer lawfully stopped the defendant for speeding. After the officer ran a computer check on the defendant's license, handed it back to him, and issued a verbal

---

*Id.* at 419-20. The court disagreed, finding that the totality of the circumstances supported the district court's conclusion that, at least until the search of the car, the encounter was consensual. *Id.* at 421.

[39] *Florida v. Bostick*, 501 U.S. 429, 434 (1991).

[40] *United States v. Drayton*, 536 U.S. 194, 202 (2002) (internal quotation marks omitted).

[41] *Id.* (internal quotation marks omitted).

[42] *Bostick*, 501 U.S. at 434.

[43] 519 U.S. 33, 35 (1996).

-18-

warning regarding the traffic violation, the officer inquired whether the defendant was carrying any illegal contraband in his car. The defendant denied having any illegal materials in the car, but upon the officer's request allowed the officer to search the vehicle. The search uncovered a small amount of marijuana in the car.[44]

At trial, the defendant unsuccessfully sought to have the evidence suppressed. On appeal, the Ohio Court of Appeals and Ohio Supreme Court determined that the evidence should have been suppressed, and the Ohio Supreme Court established a bright-line rule requiring that a motorist be clearly informed that he is free to go before the officer attempts to engage in a consensual interrogation.[45] The Supreme Court reversed the Ohio Supreme Court's holding, explaining that such a rule was inappropriate, and that instead "the proper inquiry necessitates a consideration of all the circumstances surrounding the encounter."[46]

Our own court has also recognized that consensual interrogation can follow the end of a valid traffic stop. In *Dortch*, for example, the court only found an unreasonable continuation of the defendant's detention after concluding that Dortch did not feel free to leave after the officer finished the

---

[44] *Id.* at 35–36.

[45] *Id.* at 36.

[46] *Id.* at 39 (citation and internal quotation marks omitted).

computer check on him.[47]  Also, in *United States v. Miller* we referred to two different standards to be applied to whether a defendant consents to a search: "the normal standard for *consensual searches that occur subsequent to legal stops*" and the heightened consent standard that applies to a consent to search obtained after an illegal stop.[48]  Finally, in *United States v. Brown* the court rejected the defendant's argument that an officer must inform a motorist that the legal detention has concluded before the officer can engage in consensual interrogation and request to search the vehicle.[49]

In several cases with facts similar to this case other circuits have acknowledged that a lawful traffic stop can devolve into a consensual encounter.  In *United States v. Lattimore*, the Fourth Circuit rejected the defendant's argument that an officer detained him past the conclusion of the traffic stop by questioning him concerning the presence of narcotics in the automobile.[50] Instead, the court found that the officer

> did not question Lattimore ... until after the officer had issued the citations and returned Lattimore's driver's license, indicating that all business with

---

[47] 199 F.3d 193, 199 (5th Cir. 1999).

[48] 146 F.3d 274, 279 (5th Cir. 1998) (emphasis added).

[49] 102 F.3d 1390, 1394-97 (5th Cir. 1996), *overruled in part on other grounds*, *United States v. Brown*, 161 F.3d 256 (5th Cir. 1998).

[50] 87 F.3d 647, 652 (4th Cir. 1996).

-20-

Lattimore was completed and that he was free to leave. During the subsequent conversation between [the officer] and Lattimore, a reasonable person would have felt free to decline the officer['s] requests or otherwise terminate the encounter. The totality of the circumstances presented indicate that from this point forward the encounter was consensual; Lattimore was not being detained.[51]

The Fourth Circuit reached this determination despite the fact that Lattimore was sitting in the patrol car at the time the officer had asked whether he had narcotics in his vehicle, an arguably coercive circumstance.[52]

In *United States v. White*, the defendant was stopped for an improper lane change and for driving on the shoulder.[53] The officer issued a written warning for the traffic violations, and the driver subsequently agreed to a search of his car. The Eighth Circuit held that the search was valid because the request to search was made during a consensual encounter following the end of the traffic stop.[54] It reasoned:

[The officer] handed White his license and registration and explained the warning ticket. Under the circumstances of this case, those actions ended the initial traffic stop. The events beyond that point, however, did not constitute a *Terry* stop as White contends. Instead, after White's license and registration were returned and the warning was issued, the encounter became nothing more than a consensual

---

[51] *Id.* at 653.

[52] *Id.* at 649 (citation and internal quotation marks omitted).

[53] 81 F.3d 775 (8th Cir. 1996).

[54] *Id.*

encounter between a private citizen and a law enforcement officer.[55]

Similarly, the Tenth Circuit has reasoned that continuing to question a defendant after the conclusion of the *Terry* stop is permitted if the situation has turned from a detention into a consensual encounter, which "occurs when a reasonable person in the defendant's position would feel free to leave."[56] That court has also defined the difference between a consensual encounter and an illegal detention, explaining that "once the officer has returned the driver's license and registration in a routine traffic stop, questioning about drugs and weapons or a request for voluntary consent to search may be an ordinary consensual encounter between a private citizen and a law enforcement official."[57] If the driver does receive the license, registration, and any other material back that he needs to be on his way, "a driver is illegally detained only if the driver has an objective reason to believe that he was not free to end his conversation with the law enforcement official" and leave.[58]

The Government argues that Bates's request to conduct a canine

---

[55] *Id.* at 778.

[56] *United States v. Dewitt*, 946 F.2d 1497, 1501-02 (10th Cir. 1991).

[57] *United States v. Turner*, 928 F.2d 956, 958 (10th Cir. 1991) (citations and internal quotation marks omitted); *see also United States v. Patten*, 183 F.3d 1190, 1193-94 (10th Cir. 1999).

[58] *Turner*, 928 F.2d at 958. (citation omitted).

-22-

search of the Sanchez's Suburban came in a consensual encounter, because Bates did not pose the question until after he returned Sanchez's driver's license and insurance card. The Government also emphasizes Sanchez and Cazares's testimony that they felt free to leave at that point, and that Bates had indicated to them that they could go.

From this evidence the district court concluded that "Officer Bates's conduct cannot be deemed at all coercive, and ... his request to continue on to the checkpoint was seen as a request by the Defendants, who testified that they believed they had the right to refuse if they so desired." Viewing the evidence in the light most favorable to the Government, we cannot say the district court clearly erred in this factual determination. The evidence supports the conclusion that the defendants' assent to the canine inspection came in a consensual encounter. Only after Sanchez received all of his documentation back so that he could be on his way did Officer Bates ask if Sanchez would mind proceeding to the drug checkpoint. Moreover, Officer Bates had not accused them of criminal activity such that they would regard the request as a continuation of the investigative detention.[59] Instead, the defendants admitted that they received all of their documentation and felt free to go at the conclusion of the traffic stop. Because the consensual encounter

_____

[59] *See United States v. Gonzales*, 79 F.3d 413, 420 (5th Cir. 1996) ("[A] statement by a law enforcement officer that an individual is suspected of illegal activity is persuasive evidence that the fourth amendment has been implicated.").

did not implicate Fourth Amendment concerns, the district court did not err in rejecting Sanchez's argument that the continued interaction of Sanchez and Bates following the conclusion of the *Terry* stop violated Sanchez's constitutional rights.[60]

### C.

Sanchez further asserts that the district court erred in declining to find that the drug-detection dog, Pepper, and its handler, Officer Bates, were insufficiently qualified to conduct the exterior dog sniff of the Suburban and that Pepper's indication that drugs were present in the Suburban could not have created probable cause to search the vehicle. We have repeatedly affirmed that an alert by a drug-detecting dog provides probable cause to search.[61] Moreover, in *United States v. Williams*, we held that a

---

[60] Our determination is in line with that of all circuits who have ruled on this issue except possibly the Ninth Circuit. In *United States v. Chavez-Valenzuela*, that court held that officers' questioning of the defendant following the end of a traffic stop was not consensual because the defendant had "been standing by the side of a highway for more than seven minutes" and "had [been] subjected to a number of 'fishing expedition' questions about his travel plans and his occupation." 268 F.3d 719, 724-25 (9th Cir. 2001), *as amended by* 279 F.3d 1062 (9th Cir. 2002). The court concluded that given this situation, "a reasonable motorist–even with license and registration in hand–most likely would not have believed he could disregard the officer's inquiry and end the conversation." *Id.* at 725. However, the Ninth Circuit's decision was premised at least in part on the fact that the officers had also openly stated that they suspected the defendant of criminal activity, *id.*, a circumstance not present in the case at bar and one we have held usually implicates Fourth Amendment protections. *See Gonzales*, 79 F.3d at 420.

[61] *See, e.g.*, *United States v. Dovali-Avila*, 895 F.2d 206, 207 (5th Cir. 1990).

-24-

showing of the dog's training and reliability is not required if probable cause is developed on site as a result of a dog sniff of a vehicle.[62]   Even if we were to address Sanchez's challenge of Bates's and Pepper's qualifications, it would be of no avail.   In 1997 Bates and Pepper completed the Police Narcotic Detector Dog School at the Canine Academy in Leander, Texas, and Bates received certification as a canine handler.   The record shows that the Canine Academy has been licensed by the U.S. Drug Enforcement Agency, the Texas Commission on Private Security, and the Texas Department of Public Safety since 1993.   Bates has also previously testified in court as an expert in canine handling.

The district court determined that the evidence that the dog was certified was sufficient proof of his training to make an

---

[62] 69 F.3d 27, 28 (5th Cir. 1995).   However, in *United States v. Gonzales*, we suggested that a defendant may nonetheless challenge the reliability of a drug-detecting dog, stating:

> Gonzales also attacks the reliability of the narcotics dog in one paragraph, arguing that no probable cause existed because of the dog's unreliability.   The court found the dog to be reliable, rejecting the evidence of Gonzales at the suppression hearing.   The government supports its arguments based on consent and reasonable suspicion and scarcely mentions the issue of the dog on this appeal.   Because Gonzales has shown no clear error in the district court's finding on the reliability of the drug dog, we will not disturb the finding.

79 F.3d 413, 418 (5th Cir. 1996).   "When faced with conflicting panel opinions, the earlier controls our decision." *United States v. Miro*, 29 F.3d 194, 199 n.4 (5th Cir. 1994).   *Williams*, released one year prior to *Gonzales*, thus controls this issue.   Under *Williams*, the district court was correct in refusing to take up whether the dog's training was sufficient.

effective alert. Assuming that proof of the canine's reliability was required, there was sufficient evidence in the record to support the district court's finding that the dog's alert was reliable and established probable cause for a search of the vehicle.

## III.

Sanchez last contends that his Sixth Amendment rights were violated because one of his attorneys labored under a conflict of interest and the other rendered ineffective assistance of counsel. Sanchez explains that during his pretrial proceedings, Sanchez was represented by two attorneys, Ponton and Caballero; Ponton represented both Sanchez and his co-defendant, Cazares, while Caballero represented only Sanchez. Sanchez alleges that during all pretrial proceedings Ponton was the lead attorney for both defendants, and Caballero did little or nothing on Sanchez's case. Sanchez also argues that he did not even consent for Caballero to be his attorney, because Ponton filed Caballero's notice of appearance without obtaining Sanchez's signature.

Sanchez asserts that the day before trial was to commence, Cazares talked to the government about testifying against Sanchez, but neither Ponton nor Caballero knew Cazares was going to do this. On the day of trial, when the defense attorneys discovered that Cazares intended to cooperate with the Government, Ponton withdrew as Sanchez's attorney, and Caballero was thrust into the position

of being Sanchez's sole counsel, although Ponton stated that he would try to assist her. The district court asked whether Caballero felt comfortable proceeding with Ponton's assistance, and she said yes. However, Sanchez argues that due to Caballero's alleged lack of preparation, because of her dependence on Ponton's handling of all of the pretrial matters, Caballero stumbled through the trial.

Although Sanchez characterizes his attorneys' actions as a violation of his right to conflict-free counsel, and complains that the district court did not hold a conflict hearing in accordance with Rule 44,[63] this claim is more properly analyzed as one for ineffective assistance. The prejudice he complains of came not directly from Ponton's conflict, but rather from Caballero's lack of familiarity with the case. Although certainly Ponton's conflict was what gave rise to Caballero acting as Sanchez's lead counsel, it was Caballero's unpreparedness that Sanchez argues hurt his defense.[64]

---

[63] FED. R. CRIM. P. 44(c) ("Whenever two or more defendants have been jointly charged ... or have been joined for trial ... and are represented by the same retained or assigned counsel ..., the court shall promptly inquire with respect to such joint representation and shall personally advise each defendant of the right to the effective assistance of counsel, including separate representation. Unless it appears that there is good cause to believe no conflict of interest is likely to arise, the court shall take such measures as may be appropriate to protect each defendant's right to counsel.").

[64] Although apparently Ponton continued to act as Caballero's co-counsel in Sanchez's trial, Sanchez does not raise any argument that Ponton's minimal participation in the trial prejudiced Sanchez

"The general rule in this circuit is that a claim of ineffective assistance of counsel cannot be resolved on direct appeal when the claim has not been raised before the district court since no opportunity existed to develop the record on the merits of the allegations."[65]  Instead, "[w]e have undertaken to resolve claims of inadequate representation on direct appeal only in rare cases where the record allowed us to evaluate fairly the merits of the claim."[66]  This is not one of those rare cases; Sanchez has presented the court with nothing more than speculation as to the amount of pretrial preparation Caballero performed.  Much of his claim is based on information Caballero allegedly did not know, or on documents she allegedly did not write.[67]  Accordingly, we decline to address the merits of Sanchez's ineffectiveness claim without prejudice to his presenting his claim of ineffective assistance, including any claim of conflict of interest that could not have been urged in this appeal, in a § 2255 proceeding.[68]

---

because Ponton also represented Cazares.  For example, Sanchez does not claim that his attorneys could not effectively cross-examine Cazares because Ponton represented Cazares, *see Hoffman v. Leeke*, 903 F.2d 280, 286-87 (4th Cir. 1990), or that Ponton incriminated Sanchez to save Cazares, *United States v. Newell*, 315 F.3d 510, 516-19 (5th Cir. 2002), two classic conflict-of-counsel scenarios.

[65] *United States v. Higdon*, 832 F.2d 312, 313-14 (5th Cir. 1987).

[66] *Id.* at 314.

[67] Sanchez argues that Ponton wrote all of the motions and papers Cabellero submitted on Sanchez's behalf prior to trial.

[68] *See id.*

-28-

**IV.**

In conclusion, we find no error in the district court's denial of Sanchez's motion to suppress, and decline to address his Sixth Amendment claims at this juncture.

AFFIRMED.