IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 27, 2008

Charles R. Fulbruge III
Clerk

No. 07-40326

UNITED STATES OF AMERICA

Plaintiff - Appellee

v.

ORLANDO BENAVIDES

Defendant - Appellant

Appeal from the United States District Court
for the Southern District of Texas

Before JOLLY, CLEMENT, and OWEN, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:[*]

Orlando Benavides was arrested in Laredo, Texas when police found that he was transporting crates full of cocaine and marijuana. He moved the district court to suppress the drugs as evidence against him, arguing that the police had only discovered the contents of the crates by violating his Fourth Amendment rights. The district court denied Benavides's motion and found him guilty after a brief bench trial. We REVERSE the district court's denial of this motion,

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

VACATE Benavides's conviction and sentence, and REMAND for further proceedings not inconsistent with this opinion.

I.

On May 7, 2001, Joe Benavides, a member of the Laredo Multi-Agency Narcotics Task Force, received a tip from an anonymous caller.[1] The caller reported that a pickup truck at a specific address was carrying large wooden crates and that two individuals were loading the crates with packages or bundles. The caller also provided a detailed description of the pickup truck, including its license plate number. The caller did not provide any information as to the possible contents of the bundles, and Benavides did not obtain any information about the caller's location or source of knowledge.

Benavides informed other officers on the task force about the tip and began to drive toward the address reported by the anonymous caller. While en route, he passed a truck matching the description provided by the tip and followed it in his unmarked vehicle. Benavides also informed responding task force members over radio that the truck was no longer at the reported address.

The task force coordinated with the Laredo Police Department in order to initiate a traffic stop on the truck, although at the time the truck had committed no traffic violation. A general alert regarding the truck was sent out over radio, and Officer Roland San Miguel, who was on patrol with a canine in his unit, responded. Officer San Miguel passed the truck while the truck was heading in the opposite direction, turned around, and approached the truck from the rear. The truck moved onto the improved shoulder of the road. Officer San Miguel turned on his emergency lights and initiated a traffic stop. The driver of the truck, Oscar Benavides, exited the truck, and Officer San Miguel informed him that he had been pulled over for driving on the shoulder of the road. Officer San

---

[1] Benavides testified that his secretary initially took the call, but the record does not reflect whether the call was routed to Benavides's secretary or came in directly.

Miguel then told Benavides that he was suspected of drug transportation. No traffic citation was ever issued.

Members of the task force arrived shortly after Officer San Miguel initiated the traffic stop. The investigators questioned Benavides about the contents of the crates in his truck, and Benavides told them that the crates contained motor parts. Benavides also confirmed the address given by the anonymous caller. After a disputed amount of time, the investigators presented Benavides with a search consent form, which he signed. Officer San Miguel's drug dog then alerted to the presence of drugs in the crates. The officers opened the crates and discovered 105 kilograms of cocaine and 318 kilograms of marijuana contained in bags in the crates.

Benavides was subsequently charged with conspiracy to possess and distribute controlled substances. He attempted to suppress the evidence acquired at the traffic stop, arguing that his Fourth Amendment rights were violated because he was stopped without probable cause and he did not voluntarily give his consent to be searched. The district court found that the anonymous tip provided probable cause to stop the vehicle and that consent was voluntarily given. The district court did not rely on Benavides's putative traffic violation as a basis for its decision. His motion to suppress denied, Benavides proceeded to a bench trial on stipulated facts and was found guilty. He now appeals, arguing that the district court erred in its denial of his motion to suppress.

## II.

### A.

On appeal, "we review the district court's factual findings for clear error and its legal conclusions de novo. For our review, we may consider all of the evidence presented at trial, not just that presented before the ruling on the suppression motion, in the light most favorable to the prevailing party, which in

this case is the Government." United States v. Ibarra, 493 F.3d 526, 530 (5th Cir. 2007) (internal citation omitted).

B.

We begin our analysis with the stop of Benavides's vehicle. "The Fourth Amendment prohibits unreasonable searches and seizures. There is no question but that the stopping of a vehicle and the detention of its occupants is a 'seizure' within the meaning of the Fourth Amendment." United States v. Shabazz, 993 F.2d 431, 434 (5th Cir. 1993). As such, "searches and seizures of motorists who are merely suspected of criminal activity are to be analyzed under the framework established in Terry v. Ohio, 392 U.S. 1 (1968)." Shabazz, 993 F.2d at 434 (emphasis in original). That framework permits "[a]n investigative vehicle stop . . . only when the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot." United States v. Jaquez, 421 F.3d 338, 340 (5th Cir. 2005) (internal quotation marks omitted). The government bears the burden of showing the "minimal level of objective justification" for a warrantless seizure. See id.

Here, the Government relies on the anonymous tip as the basis for the reasonable suspicion justifying Benavides's seizure. An anonymous tip can provide such reasonable suspicion, so long as it is reasonable "in light of the 'totality of the circumstances.'" See United States v. Bolden, 508 F.3d 204, 206 n.2 (5th Cir. 2007) (quoting United States v. Hernandez, 477 F.3d 210, 214 (5th Cir. 2007)). But, crucially, an anonymous tip must "be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." Florida v. J.L., 529 U.S. 266, 272 (2000).

The anonymous tip that Joe Benavides received alleged no criminal activity. It merely described the truck, the truck's location, and the fact that the truck was being loaded with unknown cargo. Although the government relies heavily on the specificity and accuracy of the tip, it can point to no specific

assertion of illegality, much less a verifiable assertion of illegality. The only further articulation of reasonable suspicion made by Benavides was that the area in which the truck was loaded was not a warehouse district. Thus, the facts alleged by the government to support its claim of reasonable suspicion show that Oscar Benavides and another man put unidentified bundles into crates and carried out these activities at an address that was not located in a warehouse district.[2] The tip alone therefore alleges only identifying information, insufficient under J.L. for a finding of reasonable suspicion. See 529 U.S. at 271–72 (finding no reasonable suspicion for seizure where anonymous tip accurately identifying a person further alleged only that the identified person was illegally carrying a gun). And the police did not improve on these bare facts in order to find reasonable suspicion before the traffic stop was made.

C.

Although it declined to rely on Benavides's alleged traffic violation before the district court and in its brief, the government did make a belated assertion at oral argument that the seizure was independently justified because Benavides violated a traffic law. The record before us does not permit this conclusion.

Police officers may stop an automobile when there is probable cause to believe that a traffic violation has occurred, even if the stop is otherwise pretextual. See United States v. Lopez-Valdez, 178 F.3d 282, 288 (5th Cir. 1999). But, "where the supposed traffic infraction that formed the basis for a vehicular stop in fact was not a violation of state law, there [is] no objective basis for probable cause justifying the stop." Id. This court has also recognized that traffic stops without probable cause and based on traffic violations may be justified under the Terry framework. E.g., United States v. Sanchez-Pena, 336 F.3d 431, 436–37 (5th Cir. 2003). Under this approach, "whether a traffic stop

---

[2] The district court also discussed the fact that these activities occurred in Laredo, Texas, apparently taking judicial notice of frequent drug-trafficking there.

complies with the Fourth Amendment depends upon two factors: whether the stop was justified at its inception and whether the Fourth Amendment intrusions were reasonably related in scope to the circumstance that justified the interference in the first place." Id. at 437. And, as discussed above, "[t]he officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion." Id. The officer's subjective motives for the stop are irrelevant. Id.

Texas law explicitly permits a vehicle operator to drive on an improved shoulder for a variety of purposes so long as "the operation is necessary and may be done safely." TEX. TRANSP. CODE § 545.058(a). Driving on an improved shoulder, without more, is therefore not a violation of a state traffic law. Cf. United States v. Miller, 146 F.3d 274, 279 (5th Cir. 1998) (finding no probable cause for a traffic stop when motorist's activities did not violate any traffic law cited by the prosecution). Officer San Miguel did not offer—and the record does not indicate— other facts tending to raise a reasonable suspicion that Benavides had committed a traffic violation by moving onto the shoulder.[3] The record does not describe any actions that Benavides took that were unsafe or unnecessary or any other factual basis for why § 545.058(a) would not apply. Indeed, Officer San Miguel allowed that Benavides's actions may have been designed to allow him to pass as he approached from behind, a scenario that § 545.058(a)(5) explicitly reaches. The absence of such facts in the record requires us to conclude that the traffic stop here did not comply with the requirements of the Fourth Amendment.

---

[3] During testimony related to the motion to suppress, Joe Benavides referred to Oscar Benavides in passing as "weaving," potentially implying that Oscar Benavides changed lanes multiple times. But the specific factual testimony offered by Officer San Miguel indicates that Benavides moved onto the improved shoulder only once. And the limited evidence in this record does not support the government's later assertions that the stop was justified because Benavides failed to drive in a single lane, see TEX. TRANSP. CODE § 545.060(a)(1), or failed to display warning flags on his cargo, see TEX. TRANSP. CODE § 547.382(b).

D.

As a general matter, "all evidence derived from the exploitation of an illegal search or seizure must be suppressed, unless the government shows that there was a break in the chain of events sufficient to refute the inference that the evidence was a product of the constitutional violation." Miller, 146 F.3d at 279. And "[c]onsent to search may, but does not necessarily, dissipate the taint of a fourth amendment violation." United States v. Chavez-Villarreal, 3 F.3d 124, 127 (5th Cir. 1993). Evidence obtained due to consent, but after a constitutional violation, will be admitted only if the consent was voluntary and if it was an independent act of free will. Id. This latter requirement focuses on the causal link between the constitutional violation and the subsequently procured evidence. United States v. Vega, 221 F.3d 789, 801 (5th Cir. 2000). "To determine whether the causal chain was broken, we consider: (1) the temporal proximity of the illegal conduct and the consent; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the initial misconduct." Chavez-Villarreal, 3 F.3d at 128. The government has the burden of showing admissibility. Id.

Here, each of the factors described in Chavez-Villarreal favors suppression. The district court correctly determined that Benavides had given his consent shortly after he was illegally detained: The anonymous call was received at 10:00 a.m. and the consent form shows that it was completed at 10:35 a.m. Cf. id. (finding first factor favored suppression when less than fifteen minutes elapsed between illegal stop and consent for search). The record gives no indication of intervening circumstances between the illegal stop and Benavides's consent to the search. Instead, four members of the narcotics task force arrived immediately after Officer San Miguel stopped Benavides, identified themselves as narcotics officers, and sought Benavides's consent. Although they told

7

Benavides he could refuse consent, the record does not show that he was told that he was free to leave, and the circumstances of the stop indicate that he would have had no reason to believe that this option was available. See United States v. Santiago, 310 F.3d 336, 343 (5th Cir. 2002); United States v. Jones, 234 F.3d 234, 243 (5th Cir. 2000). And, finally, the record plainly shows that the purpose for stopping Benavides was to search Benavides's truck for drugs. The government has not shown any way in which the consent to search was not contemporaneous with the constitutional violation. See Santiago, 310 F.3d at 343. Accordingly, Benavides's consent does not "dissipate the taint" of the initial illegal seizure.

## III.

Officer San Miguel seized Oscar Benavides in violation of the Fourth Amendment. This violation was not cured by the consent form that Benavides signed. Consequently, the district court should have granted Benavides's motion to suppress. We accordingly REVERSE the district court's denial of the motion to suppress, VACATE Benavides's conviction and sentence, and REMAND for further proceedings not inconsistent with this opinion.

REVERSED, VACATED, AND REMANDED

EDITH BROWN CLEMENT, Circuit Judge, dissenting:

I respectfully dissent from the majority's reversal of the denial of Benavides's motion to suppress, because I believe that the "totality of the circumstances" provided reasonable suspicion to stop Benavides's vehicle.

The majority's holding that the stop was unconstitutional relies on Florida v. J.L., in which an anonymous caller reported to the police that a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun. 529 U.S. 266, 268 (2000). The police arrived at the bus stop, identified a black male with a plaid shirt, frisked him, and seized a gun from his pocket. Id. The defendant was 15 years-old at the time of his arrest, and he was charged under state law with carrying a concealed firearm without a license and possessing a firearm while under the age of eighteen. Id. at 269. The Supreme Court held that the anonymous tip could not support a finding of reasonable suspicion in that case, because it was reliable only "in its tendency to identify a determinate person," but not "in its assertion of illegality." Id. at 272.

The tip received by the police in J.L. was entirely bare of any element linking the identified individual with criminal activity. The only allegation raised by the J.L. tipster was that the individual was in possession of a gun, an act that is not inherently illegal. This court has distinguished reasonable suspicion of gun possession, which, by itself, cannot justify an investigative stop, from "reasonable suspicion concern[ing] the possession of narcotics, an act that is per se illegal." United States v. Roch, 5 F.3d 894, 899 (5th Cir. 1993). In this case, even though the tipster did not explicitly refer to the presence of narcotics in the crates, the context of the call clearly indicated that he was reporting drug-related activity. At oral argument, the parties were unable to explain how the call got to the desk of Joe Benavides, a

member of a police task force specializing in narcotics law enforcement. Nevertheless, either the call was transferred to the Laredo Multinarcotics task force by some other police entity, such as a 9-1-1 operator—in which case the tipster necessarily must have indicated during this initial conversation that he was suspecting narcotics activity; or the tipster directly called the Laredo Multinarcotics task force—in which case, Joe Benavides could not only legitimately conclude that the tip concerned narcotics-related conduct, but also assume that the tipster had some experience in reporting this type of activity. See United States v. Hernandez, 477 F.3d 210, 215 (5th Cir. 2007) (noting that "[t]he tipster call was a rifle-shot to the nearest checkpoint facility, out of which the roving patrols were based, as opposed to any other office in the Laredo Sector, suggesting familiarity with the Border Patrol and knowledge and experience with reporting illegal activity"). In either case, Joe Benavides was obviously aware that the tipster was reporting drug-trafficking activity and had no reason to delay his verifying the information with further questioning.[1] The majority opinion fails to consider the nature of the information reported and the context in which the call was received, which distinguish this case from J.L. In summarily concluding that the tip contained only "identifying information" insufficient to provide reasonable suspicion for the stop under J.L., it ignores the spirit of the "totality of the circumstances" approach, which requires this court to "eschew[] bright-line rules, instead emphasizing the fact-specific nature of the . . . inquiry." United States v. Brigham, 382 F.3d 500, 507 (5th Cir. 2004) (internal quotation omitted).

---

[1] In fact, had Joe Benavides prolonged the call, he may not have been able to follow up on the information reported, because the pick-up truck had left the location identified by the tipster and was spotted by Joe Benavides while en route to that location.

"Instead of adopting any bright line rule, courts must examine the factual circumstances surrounding each anonymous phone tip to determine whether the police reasonably could have considered it to be sufficiently reliable information as a basis for their actions." United States v. Casper, No. 06-11381, 2008 WL 2779268, at *7 (5th Cir. July 18, 2008) (Dennis, J., concurring). The "factual circumstances" typically considered by this court—and which the majority fails to examine—include

the the credibility and reliability of the informant, the specificity of the information contained in the tip or report, the extent to which the information in the tip or report can be verified by officers in the field, and whether the tip or report concerns active or recent activity, or has instead gone stale.

United States v. Gonzalez, 190 F.3d 668, 672 (5th Cir. 1999). Where the tip was anonymous, as here, the police have no means of assessing the "credibility and reliability of the informant." Id. Nevertheless, there are situations in which an anonymous tip exhibits "sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop," Alabama v. White, 496 U.S. 325, 327 (1990), particularly where, as here, all of the other Gonzalez factors are satisfied. See Casper, 2008 WL 2779268, at *4 (noting that "[w]here the tip is anonymous, the credibility and reliability of the informant cannot be determined, and the government must establish reasonable suspicion based on some or all of the other factors"). The information provided by the tipster was very specific, and included a detailed description of the pick-up truck and its license plate number; every element of that description was validated by Joe Benavides before the vehicle was stopped. In addition, the tipster was reporting ongoing events as he was observing them, which gives additional credence to the tip. See United States v. Bolden, 508 F.3d 204, 206 n.2 (5th Cir. 2007) (holding that reasonable suspicion to stop individuals involved in a shooting was warranted when "the

tip was specific as to location of the shooting and dealt with recent or even ongoing activity, and the officers could verify the information, because they personally heard the gunshots" (internal quotations omitted)).  In light of these factors, I believe that the tip, though anonymous, presented sufficient "indicia of reliability" to form the basis for the stop of Benavides's vehicle.

Finally, the majority notes, but fails to take into account, two other elements that bolster the police's reasonable suspicion.  First, Joe Benavides testified that the activity reported struck him as suspicious because the truck was allegedly being loaded at a location that is not in a warehouse area.  The majority should have given this testimony of a police officer who specialized in narcotics work the "due weight" it is entitled to in light of his "experience and expertise."  Ornelas v. United States, 517 U.S. 690, 699 (1996).  Second, the district court, in denying Benavides's motion to suppress, considered the fact that the activities reported were taking place in Laredo, Texas, a city located near the Mexican border—presumably, an area where drug-trafficking is frequent.  The majority notes this observation in a footnote without explaining how it affects its analysis, even though it is well-established that "[t]he characteristics of the area in which the vehicle was encountered and the area's proximity to the border are important considerations in the reasonableness determination."  Hernandez, 477 F.3d at 213; see also United States v. Mendenhall, 446 U.S. 544, 563–64 (1980) (recognizing that "[l]aw enforcement officers may rely on the characteristics of the area" to form their "reasonable suspicion" of criminal activity (internal quotation omitted)).  Though these elements "by themselves may appear innocent," they are combined here with a highly specific tip corroborated by the police; this falls squarely within the ambit of situations in which all factors considered "in the aggregate rise to the level of reasonable suspicion." United States v. Ibarra-Sanchez, 199 F.3d 753, 759 (5th Cir. 1999).

In light of the foregoing, I disagree with the majority's holding that the investigative stop of Benavides's vehicle was a violation of the Fourth Amendment. Therefore, the search of the truck bed, which uncovered the narcotics evidence at issue, was not tainted by a prior unconstitutional stop. The Fourth Amendment permits police officers who have lawfully detained a vehicle to search it without first obtaining a warrant so long as they "have either the consent of the owner to conduct the search or probable cause to believe that the vehicle contains contraband or other evidence of a crime." United States v. Mendoza-Gonzalez, 318 F.3d 663, 666 (5th Cir. 2003). Shortly after Benavides was pulled over, Officer San Miguel conducted a "canine sniff" by a narcotics-detection dog around the exterior of a vehicle. This "free-air search" does not constitute a "search or seizure" under the Fourth Amendment and can be conducted without consent. United States v. Duffaut, 314 F.3d 203, 208 (5th Cir. 2002). And "[o]nce a dog has alerted to the presence of narcotics, agents have sufficient probable cause to conduct a search of the vehicle." Id. Therefore, after the dog alerted to the crates loaded in the truck bed, the police had probable cause to search the truck and open the crates, and Benavides's consent was not required.[2]

For these reasons, I would affirm the district court's denial of Benavides's motion to suppress.

---

[2] Because the search of Benavides's vehicle was justified by probable cause, I do not reach the issue of whether Benavides's consent to the search was voluntary. Nevertheless, it is worth noting that Benavides's argument that his consent was involuntarily given is inconsistent with his testimony at the suppression hearing, where he stated that he had enough education to read and understand the consent form, that he in fact understood the form, and that he knew he had the right to refuse to sign it. See United States v. Jones, 234 F.3d 234, 242 (5th Cir. 2000) (noting the six factors typically examined by this court in assessing voluntariness of consent: "1) the voluntariness of the defendant's custodial status; 2) the presence of coercive police procedures; 3) the extent and level of the defendant's cooperation with the police; 4) the defendant's awareness of his right to refuse consent; 5) the defendant's education and intelligence; and 6) the defendant's belief that no incriminating evidence will be found").