# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

November 9, 2007

Charles R. Fulbruge III
Clerk

)))))))))))))))))))))))))))

No. 06-40719

)))))))))))))))))))))))))))

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

JOSE EDELMIRO MENDIETA-GARZA

Defendant-Appellant

Appeal from the United States District Court
for the Southern District of Texas
No. B-05-975

Before DAVIS, DENNIS, and PRADO, Circuit Judges.

PER CURIAM:[*]

United States Border Patrol agents arrested Defendant-Appellant Jose Edelmiro Mendieta-Garza ("Mendieta-Garza") after discovering 2.16 kilograms of cocaine on his person during an immigration inspection.  Mendieta-Garza filed a motion to suppress, arguing that the discovery of the cocaine resulted from an

---

[*] Pursuant to 5TH CIRCUIT RULE 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIRCUIT RULE 47.5.4.

illegal seizure in violation of the Fourth Amendment. The district court denied the motion, proceeded to trial, and ultimately found Mendieta-Garza guilty of conspiracy and possession with the intent to distribute more than 500 grams of cocaine in violation of 21 U.S.C. § 841 (a)(1) and (b)(1)(B). Mendieta-Garza now appeals the district court's denial of his motion to suppress. For the reasons that follow, we AFFIRM the district court's denial of Mendieta-Garza's motion to suppress.

## I. FACTUAL AND PROCEDURAL HISTORY

On November 4, 2005, at approximately 2:15 or 2:30 p.m., an Adame Bus Line ("Adame") bus traveling from Matamoros, Mexico, to Houston, Texas, made a scheduled stop at the Circle K convenience store at the intersection of Tyler and Highway 77 in Harlingen, Texas, in order to pick up and drop off passengers. Prior to arriving in Harlingen, the bus had undergone an immigration inspection at the Los Tomates Bridge border crossing, and had picked up passengers, without immigration inspection, in Brownsville, Texas.[1] United States Border Patrol Agents Jesus Sanchez ("Agent Sanchez"), Eric Castillo ("Agent Castillo"), and Robert Moya ("Agent Moya") decided to conduct an immigration inspection while the bus was at the Circle K stop.[2] The agents were in uniform and armed.

---

[1] Mendieta-Garza boarded the bus at the Brownsville stop.

[2] Adame has a policy of allowing immigration officials to board their buses and conduct immigration checks on their passengers. Adame places notices in bus terminals in public view

2

Agents Sanchez and Castillo boarded the bus after all the passengers had boarded, and Agent Moya remained outside, inspecting the luggage compartment underneath the bus with his dog.[3] Agent Castillo entered the bus first, with Agent Sanchez following immediately behind. Agent Sanchez, while standing in the aisle at the front of the bus, made the following announcement in English and Spanish: "Immigration inspection. If you are not a U.S. citizen, please have your papers ready to produce them."[4] Agent Castillo was making his way to the back of the bus as Agent Sanchez made his announcement.

Agent Sanchez conducted the inspection by working his way from the front of the bus toward the back while asking each passenger "if they're a U.S. citizen or not." If a passenger stated that he was not a U.S. citizen, Agent Sanchez then asked "[d]o you have any documents?" Agent Sanchez then waited for the passenger to produce the documents. As he conducted the inspection of each passenger, he "[stood] next to the person in the aisle that [he was] talking to."

Mendieta-Garza was seated seven or eight rows from the front of the bus. Agent Sanchez inspected Mendieta-Garza, was satisfied that he was in the country legally, and proceeded to the next passenger.

---

which advise its customers that Adame cooperates with American authorities.

[3] The dog was trained to detect humans and contraband such as drugs.

[4] Agent Moya testified that the agents normally make the following announcement when boarding the bus: "We're United States Border Patrol agents, and we're going to conduct an immigration check."

At some point during Agent Sanchez's inspection, Agent Moya completed his inspection of the luggage compartment and boarded the bus without his dog. The other agents were toward the rear of bus by the time Agent Moya boarded. Agent Moya began to inspect passengers at the front of the bus because he mistakenly believed that Agent Sanchez had started his inspections at the back of the bus and had not yet inspected the passengers at the front of the bus.

Agent Moya approached Mendieta-Garza, asked him in English "to state his citizenship," and Mendieta-Garza replied in Spanish "Carolina."[5] Agent Moya then began to converse with Mendieta-Garza in Spanish, asking "[o]f what country are you a citizen?" Mendieta-Garza replied "Mexico." According to Agent Moya, Mendieta-Garza was "a little nervous" and "actually shying away from me, kind of avoiding any kind of visual contact . . . ." Agent Moya then asked Mendieta-Garza about his status in this country, and Mendieta-Garza replied that he was a resident alien living in Brownsville. Agent Moya next asked Mendieta-Garza to produce an I-551 document, which would have had a photo ID and indicated Mendieta-Garza's permanent resident status.

In response to Agent Moya's request for the I-551, Mendieta-Garza reached into his rear pocket with his right hand. At this point, Agent Moya noticed a bundle protruding from the front of Mendieta-Garza's shirt. Agent Moya

---

[5] During the encounter, Agent Moya was standing in the aisle, which is about two feet wide, next to and about a "foot-and-a-half" from the top of Mendieta-Garza's head.

4

believed, based on his training and experience, that Mendieta-Garza was a "body carrier," that is, someone who smuggles contraband on his person, and that he might be concealing a weapon. He noticed that Mendieta-Garza was dressed in a baggy, loose-fitting, duck-tailed shirt and was wearing a jacket, even though the temperature was a little over ninety degrees. Mendieta-Garza was shaking and perspiring as he produced the document.

Agent Moya, now concerned for the agents' safety, asked Mendieta-Garza if he had any weapons on him to which Mendieta-Garza replied "no." He then asked Mendieta-Garza if he objected to a "pat-down," and Mendieta-Garza again said "no." Mendieta-Garza began to stand-up, but Agent Moya explained that he could perform the pat-down while Mendieta-Garza was seated and that the pat-down was just for safety.

Agent Moya performed the pat-down. He reached around the small of Mendieta-Garza's back and felt another bundle. Upon discovering the bundle, Agent Moya asked Mendieta-Garza to stand-up and to explain what was in the bundles. Mendieta-Garza replied "cocaine." Agent Moya, now assisted by Agent Sanchez, handcuffed Mendieta-Garza and escorted him off the bus.[6]

On November 29, 2005, Plaintiff-Appellee United States of America ("the

_____

[6] At about the time when Agent Moya asked Mendieta-Garza not to stand-up for the pat-down, Agent Sanchez heard Agent Moya raise his voice and he noticed that Mendieta-Garza was standing up. Agent Sanchez walked to where Agent Moya was standing and stood in the aisle behind Mendieta-Garza's seat.

5

government") charged Mendieta-Garza with two counts, conspiracy and possession with the intent to distribute more than 500 grams of cocaine in violation of 21 U.S.C. § 841(a)(1) & (b)(1)(B). Mendieta-Garza filed a motion to suppress the evidence on December 12, 2005. The district court held an evidentiary hearing on January 4, 2006, and January 6, 2006, and denied the motion to suppress at the end of the hearing. On January 9, 2006, Mendieta-Garza waived his right to a jury trial and the district court subsequently found him guilty on both counts. Mendieta-Garza received a thirty-eight month sentence with four years of supervised release.

Mendieta-Garza now appeals the district court's denial of his motion to suppress the evidence.

## II. JURISDICTION AND STANDARD OF REVIEW

This is an appeal from a final judgment of conviction and sentence in the district court, so this court has jurisdiction under 28 U.S.C. § 1291.

"In considering a ruling on a motion to suppress, we review the district court's factual findings for clear error and its legal conclusions, including its ultimate conclusion as to the constitutionality of the law enforcement action, de novo." United States v. Chavez, 281 F.3d 479, 483 (5th Cir. 2002). We review the evidence in the light most favorable to the party that prevailed in the district court--in this case, the government. Id. This court "may uphold the denial of a

motion to suppress if there is any reasonable view of the evidence to support it."

United States v. Chacon, 330 F.3d 323, 326 (5th Cir. 2003) (citations omitted).

## III. DISCUSSION

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. CONST. amend. IV. We have observed that "[a] search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing." United States v. Portillo-Aguirre, 311 F.3d 647, 652 (5th Cir. 2002) (quoting City of Indianapolis v. Edmond, 531 U.S. 32, 37 (2000)). Nevertheless, the Supreme Court has consistently stated that not all encounters between law enforcement officers and citizens are seizures for Fourth Amendment purposes. See, e.g., Florida v. Royer, 460 U.S. 491, 497 (1983) (citing numerous cases articulating this principle). For example, if an officer simply approaches an individual and asks a few questions, the Supreme Court has described this scenario as a consensual encounter, and not a seizure. Florida v. Bostick, 501 U.S. 429, 434 (1991).

A consensual encounter between an officer and a citizen will ripen into a seizure, thereby triggering the Fourth Amendment and requiring the officers to articulate reasonable suspicion or probable cause, "only when the officer, by means of physical force or show of authority, has in some way restrained the

7

liberty of [the] citizen." United States v. Mask, 330 F.3d 330, 336 (5th Cir. 2003) (quoting Terry v. Ohio, 392 U.S. 1, 19 (1968)). The Supreme Court has reduced this principle to a test for determining when a seizure occurs. A Fourth Amendment seizure occurs "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." Id. (citing United States v. Mendenhall, 446 U.S. 544, 554 (1980)). The reasonable person standard is objective. It does not concern itself with the citizen's subjective perception of the officer's subjective intent, but only with what the officer's words and conduct would have conveyed to a reasonable and innocent person. Id. We have observed that "[t]he officers' objective conduct, not their subjective intentions or private conversations, is relevant to the seizure determination." Id. at 337.

The Supreme Court has, on two occasions, attempted to map the boundary between a permissible consensual encounter and an unconstitutional seizure when an officer approaches and questions a passenger on a bus. In Bostick, the Court noted that when a "person is seated on a bus and has no desire to leave, the degree to which a reasonable person would feel that he or she could leave is not an accurate measure of the coercive effect of the encounter." 501 U.S. at 435-36. Instead of the "free to leave" standard, the Court held that in situations where freedom of movement is restricted by a factor independent of police conduct--such

8

as being on a bus--"the appropriate inquiry is whether a reasonable person would feel free to decline the officer's requests or otherwise terminate the encounter." Id. at 436. The crucial test is whether a reasonable person would have felt at "liberty to ignore the police and go about his business." Id. at 437. The Court made it clear that the proper inquiry involves a consideration of "all the circumstances surrounding the encounter." Id. at 439. Though the Court ultimately refrained from deciding whether a seizure occurred, it expressed "some doubt" that a seizure occurred given that "the officers did not point guns at Bostick or otherwise threaten him and that they specifically advised Bostick that he could refuse consent." Id. at 437.

The Court revisited officer-citizen encounters on buses in United States v. Drayton, 536 U.S. 194 (2002). In Drayton, three members of the Tallahassee Police Department boarded a Greyhound bus that had made a scheduled stop in order to perform a routine drug and weapons interdiction. The officers were dressed in plain clothes, carried concealed weapons, and had visible badges. Id. at 197. One officer remained stationed at the front of the bus and one at the rear, while the third officer worked his way from the rear of the bus to the front. The interviewing officer managed to avoid blocking the aisle by standing next to or just behind each passenger with whom he spoke. Id. at 198. In considering whether a seizure occurred, the Supreme Court noted "[t]here was no application of force,

no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of exits, no threat, no command, not even an authoritative tone of voice." Id. at 204. The Court further observed that the fact that the officers were in uniform and visibly armed should have little weight in the seizure analysis. Id. Finally, the fact that one officer was stationed at the front of the bus did not necessarily indicate that there had been a seizure because the officer "did nothing to intimidate the passengers, and he said nothing to suggest that the people could not exit, and indeed he left the aisle clear." Id. at 205. On these facts, the Court agreed with the district court, which found that there "was nothing coercive or confrontational" about the encounter. Id. at 204.

In this case, Mendieta-Garza argues that the Border Patrol Agents illegally seized him in violation of the Fourth Amendment by engaging in the following actions: (1) making a show of authority and announcing to the passengers en masse that they were going to be inspected and were required to produce their identification papers; (2) blocking the aisle while standing next to each passenger being questioned; (3) stationing Agent Moya at the front of the bus behind Agents Sanchez and Castillo to prevent passengers from leaving without being inspected; (4) interrogating each passenger about his citizenship while blocking the aisle, demanding documents, and waiting for the passengers to produce them; and (5) having Agent Moya "take another run" at Mendieta-Garza after he had already

10

been inspected by Agent Sanchez. Relying heavily on the Supreme Court's decision in Drayton, Mendieta-Garza contends that, in light of all of the foregoing circumstances, a reasonable person would not have felt free to decline the agents' requests or otherwise terminate the encounter.

According to Mendieta-Garza, all of the passengers on the bus were seized in violation of the Fourth Amendment when Agent Sanchez announced, "Immigration inspection. If you are not a U.S. citizen, please have your papers ready to produce them." Mendieta-Garza characterizes this announcement as a command to the passengers that they were going to be inspected and that they were required to produce their identification papers. Contrary to Mendieta-Garza's position, Agent Sanchez's statement did not constitute a seizure because it would not have convinced a reasonable person that he was not free to terminate the encounter or decline the request. Agent Sanchez did not make the statement in an intimidating or coercive manner which would have suggested that compliance was compulsory. For example, it is clear from the suppression hearing that Agent Sanchez did not brandish his weapon, make a threat, or speak in an authoritative tone of voice. See United States v. Boone, 67 F.3d 76, 78-79 (5th Cir. 1995) (holding there was no seizure where the officers issued a general order to leave the bus); see also United States v. Ojeda-Ramos, 455 F.3d 1178, 1184 (10th Cir. 2006) (holding officer's order to leave bus and claim luggage not a seizure

11

where he did not "demand, intimidate, threaten, or use force against" the passengers).

Next, Mendieta-Garza argues that a seizure occurred when Agent Sanchez blocked the aisle by standing next to the passengers as he questioned them. The fact that Agent Sanchez may have blocked the aisle by standing next to the passengers as he asked them questions does not, by itself, establish that a seizure occurred. In INS v. Delgado, the Supreme Court held that a seizure did not occur even though INS agents were stationed near the exits of a factory in which the agents were conducting an immigration inspection. 466 U.S. at 219. Furthermore, the Supreme Court has stressed that a Fourth Amendment analysis requires a consideration of all circumstances and that there are no "litmus-paper" tests for determining a seizure. See Ohio v. Robinette, 519 U.S. 33, 39 (1996) (examining "the totality of the circumstances"); Royer, 460 U.S. at 506 (rejecting a "litmus-paper test"). Given that Agent Sanchez's manner was not intimidating or coercive, we will not find that a seizure occurred based on the bare fact that Agent Sanchez stood next to the passengers as he questioned them.[7]

Even if a seizure did not occur when Agent Sanchez stood next to the passengers as he questioned them, Mendieta-Garza contends that a seizure

_____

[7] Mendieta-Garza also contends that all the passengers were seized because Agent Moya took up a position at the front of the bus. This argument lacks merit since a reasonable person would not believe that Agent Moya blocked the exit because, rather than standing guard at the front of the bus, he began to conduct inspections at the front of the bus.

12

occurred when Agent Sanchez asked for documents and waited for the passengers to produce the requested documents. According to Mendieta-Garza, Agent Sanchez's waiting, in combination with his initial announcement and his standing next to the passengers, resulted in a seizure. We disagree. That an officer waits for compliance with his request would not suggest to a reasonable person that compliance with that request was compulsory. In fact, one could argue that the encounter with Agent Sanchez would have been more coercive had he forcefully demanded immediate compliance with his request for documentation.

Finally, Mendieta-Garza contends that he was seized when Agent Moya began questioning him about his immigration status <u>after</u> Agent Sanchez had already done so. The fact that Agent Moya "took another run" at Mendieta-Garza makes this a close case.[8] See Boone, 67 F.3d at 78-79 (observing that second encounter with agents made seizure determination a "close case"). Though we have been unable to locate any cases with nearly identical facts to this case, our precedent regarding encounters between police officers and citizens after a traffic stop provides some guidance. We have recognized previously that a "consensual interrogation can follow the end of a valid traffic stop." United States v. Sanchez-

---

[8] The government argues that Agent Moya could not have "taken a second run" at Mendieta-Garza because Agent Moya did not know that Agent Sanchez had already inspected him. The agents' subjective intentions and knowledge are legally irrelevant. Our focus is on how a reasonable objective person would have perceived the agents' objective conduct. Mask, 330 F.3d at 337.

Pena, 336 F.3d 431, 442 (5th Cir. 2003).[9]  In other words, a second round of questioning does not necessarily result in a seizure.

In Sanchez-Pena, an officer pulled over Sanchez-Pena after he observed him driving at a low speed on the shoulder of the road. Id. at 434.  A check of Sanchez-Pena's record revealed that there were no outstanding warrants, and the officer returned Sanchez-Pena's license and insurance card.  The officer then asked Sanchez-Pena if he would drive down the road to a checkpoint so that a dog could sniff his car. Id. at 434-35.  Sanchez-Pena agreed and a dog alerted to drugs in his car at the checkpoint.  Id. at 435.  Sanchez-Pena moved to suppress the drug evidence, arguing that his consent to the dog sniff was invalid because it was based on the officer's illegal detention of him following a valid traffic stop.  Id. at 438.  This court disagreed, holding that Sanchez-Pena's consent to the canine inspection resulted from a consensual encounter that did not implicate the Fourth Amendment. Id. at 443.  The Sanchez-Pena court noted that the officer only asked Sanchez-Pena if he would mind proceeding to the checkpoint after the officer had returned Sanchez-Pena's documentation.  Id.  Furthermore, the officer did not accuse Sanchez-Pena of criminal activity, so Sanchez-Pena would not have viewed the "request as a continuation of the investigative detention."  Id.

---

[9] Traffic stops are analyzed under the standards announced for investigative detention in Terry v. Ohio.  Sanchez-Pena, 336 F.3d at 436-37.

14

Applying the lessons of Sanchez-Pena to this case, we hold that Agent Moya's initial questioning of Mendieta-Garza was a consensual encounter, and not a seizure.[10] After Agent Sanchez inspected Mendieta-Garza, he returned Mendieta-Garza's immigration documents. Agent Sanchez never accused Mendieta-Garza of criminal activity. The first encounter between Agent Sanchez and Mendieta-Garza had ended, and a reasonable person would have felt free to decline Agent Moya's subsequent requests or to terminate the encounter. See United States v. Ricardo, 472 F.3d 277, 283-84 (5th Cir. 2006) (holding that a second encounter with an officer did not result in a seizure where the first encounter, a traffic stop, had ended and the officer had returned all of the appellant's documents); see also United States v. Esparza-Mendoza, 386 F.3d 953, 958-59 (10th Cir. 2004) (making a second request, or even a second demand, for identification does not, by itself, implicate the Fourth Amendment). Prior to noticing a bulge under Mendieta-Garza's shirt, Agent Moya did not apply any force, make an intimidating movement or an overwhelming show of force, or issue a threat or command. See Drayton, 536 U.S. at 204 (finding no seizure where there "was no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of exits, no threat, no

---

[10] At oral argument, counsel for Mendieta-Garza conceded that Agent Moya had reasonable suspicion to justify a Terry pat-down after Agent Moya noticed the bulge under Mendieta-Garza's shirt. Therefore, on appeal, Mendieta-Garza only challenges Agent Moya's actions leading up to the discovery of the bulge.

15

command, not even an authoritative tone of voice"). Though Mendieta-Garza was asked twice about his immigration status, because neither interrogation was coercive or confrontational, we hold that Mendieta-Garza was not seized in violation of the Fourth Amendment. See id. at 204 (holding there was no seizure where there "was nothing coercive or confrontational" about the encounter with law enforcement).

## IV. CONCLUSION

For the reasons stated above, we AFFIRM the judgment of the district court.

AFFIRMED.

DENNIS, Circuit Judge, concurring in the judgment:

Although I am convinced that the majority reached the right result, I find the issue very close as to whether the United States Border Patrol agents committed a Fourth Amendment "seizure" when they questioned alien bus passengers, such as Mendieta-Garza, and asked to inspect their immigration papers. The answer turns on whether a reasonable person in Mendieta-Garza's position would have believed that he was free to terminate the encounter by refusing to answer the questions put to him by the Border Patrol agents. I believe that this panel need not decide that question, however, because any "seizure" that may have taken place was reasonably permissible under the rationale of the Supreme Court's decision in United States v. Martinez-Fuerte, 428 U.S. 543 (1976). See also INS v. Delgado, 466 U.S. 210, 221 (1984) (Powell, J., concurring in the result); United States v. Hernandez-Zuniga, 215 F.3d 483 (5th Cir. 2000).

In Martinez-Fuerte, the Supreme Court held that stopping automobiles for brief questioning at permanent traffic checkpoints away from the Mexican border is consistent with the Fourth Amendment and need not be authorized by a warrant. The Court assumed that the stops constituted "seizures" within the meaning of the Fourth Amendment, see id. at 546 n.1, but upheld them as reasonable. As in prior cases involving the apprehension of aliens illegally in the United States, the Court weighed the public interest in the practice at issue

17

against the Fourth Amendment interest of the individual. See id. at 555. Noting the importance of routine checkpoint stops to controlling the flow of illegal aliens into the interior of the country, the Court found that the Government had a substantial interest in the practice. On the other hand, the intrusion on individual motorists was minimal: the stops were brief, usually involving only a question or two and possibly the production of documents. Moreover, they were public and regularized law enforcement activities vesting limited discretion in officers in the field. Weighing these considerations, the Court held that the stops and questioning at issue, as well as referrals to a slightly longer secondary inspection, might be made "in the absence of any individualized suspicion" that a particular car contained illegal aliens. Id. at 562-63; see also Delgado, 466 U.S. at 222 (Powell, J., concurring in the result).

The balance of interests in this case is similar. The Government's interest in approaching and questioning alien bus passengers at scheduled bus stops with the permission of bus operators is great. The intrusion into the Fourth Amendment interests of the bus passengers, on the other hand, is small and probably less than it was in Martinez-Fuerte: there, cars often were stopped for up to five minutes when they were diverted to answer a few questions and display car registration papers; here, each bus passenger who stated he or she was not a citizen was confronted for no more than one or two minutes and asked to display

18

immigration papers, unless reasonable suspicion arose to warrant further inquiry. Bus passengers were notified in advance of bus routes, scheduled stops, and the possibility of Border Patrol inspections at certain stops. Thus, the Border Patrol agents' entry of buses at bus stops was no more of a surprise than motorists' encounters of Border Patrol agents at permanent checkpoints and much less than that of the workers who encountered INS agents conducting factory surveys for illegal aliens approved by the Court in Delgado. The obviously authorized character of the operation, the clear purpose of seeking illegal aliens, and the systematic and public nature of the bus stop checks serve to minimize any concern or fright on the part of innocent passengers. Moreover, the bus passengers' expectation of privacy, like that of motorists, certainly is far less than the traditional expectation of privacy in one's residence. Therefore, for the same reasons that the Court upheld the checkpoint stops in Martinez-Fuerte without any individualized suspicion, I would find the brief questioning and seizure of bus passengers here to be reasonable.

The Court in Martinez-Fuerte also held that no particularized reason was necessary to refer motorists to the secondary inspection area for a slightly more intrusive "seizure." 428 U.S. at 563-564. Similarly, I would hold in this case that the second questioning of Mendieta-Garza was not an unreasonable seizure, because it was unintentional, was of brief duration, and caused no delay in the

bus departure because it occurred while agent Sanchez was completing his questioning of other passengers.  Certainly, this additional delay and intrusion was no greater than that incurred by the referral of cars and passengers to the secondary inspection area that the Supreme Court approved in Martinez-Fuerte.