# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-40126

United States Court of Appeals
Fifth Circuit

**FILED**

July 16, 2015

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

   Plaintiff - Appellee

v.

RUBEN PENA-GONZALEZ,

   Defendant - Appellant

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 7:13-CR-564

Before JONES, SMITH, and COSTA, Circuit Judges.

PER CURIAM:*

  Traffic stops on the stretch of U.S. Highway 77 that runs through South Texas have given rise to a number of Fourth Amendment cases, including a seminal Supreme Court decision addressing stops at fixed immigration checkpoints. *See United States v. Martinez-Fuerte*, 428 U.S. 543 (1976) (involving a stop at an immigration checkpoints on Highway 77 near Sarita, Texas). This is yet another case. We must decide whether reasonable

---

  * Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 14-40126

suspicion of criminal activity justified the Defendant's continued detention after the purpose of the initial traffic stop ended.

## I.

On March 9, 2011, Kingsville Police Department Officer Mike Tamez was patrolling Highway 77 southbound when he detected a Chevy Tahoe speeding. Tamez pulled alongside the Tahoe and saw three people—two adults and a child. He also noticed air fresheners hanging throughout the car, several rosaries on the rearview mirror, and four bumper stickers showing support for D.A.R.E.[1] and law enforcement. Tamez turned on his patrol lights and pulled over the Tahoe for speeding two miles over the limit.

Tamez parked his patrol car behind the Tahoe and approached on the passenger side. Mr. Peña-Gonzalez sat in the passenger seat; his wife—Nohemi Peña—was driving. When they rolled down the window, Tamez smelled an overwhelming odor of air freshener and counted four air fresheners hanging throughout the vehicle. He also noticed Pancho Villa and St. Jude symbols on Mrs. Peña's key chain. He requested Mrs. Peña's driver's license and insurance, and then went around to the driver's side and asked her to step out of the vehicle.

Mrs. Peña got out and Officer Tamez began talking with her. Tamez explained that he pulled her over for speeding, and Mrs. Peña responded that her daughter needed to use the restroom. Tamez then asked several questions about Mrs. Peña and her journey. She said she and her family were coming from Houston and traveling home to Mission, which Tamez found odd because her insurance said they lived in Palmview (apparently a suburb of Mission, though there is no indication that Tamez knew this[2]). Mrs. Peña stated that

---

[1] Drug Abuse Resistance Education.

[2] Kingsville is more than 100 miles from Mission.

No. 14-40126

they had been in Houston so her husband could attend a car auction. Tamez asked if they bought anything at the auction. Mrs. Peña initially said no, though she quickly changed her answer to say that he did find an Impala and some other car but her husband was in charge of that. Tamez then asked how many days they spent in Houston. Mrs. Peña paused for almost four seconds and then said "one day." When Tamez followed up about when they had left for Houston, she told him "the day before yesterday," so they had in fact spent two nights in Houston. Tamez asked where they stayed in Houston, and she said an "American Best Inn" somewhere off Highway 249. Tamez told her he would let her off with a warning. After Mrs. Peña thanked him, Tamez asked if he could talk to her husband and she agreed. These events transpired in under four minutes, with the conversation between Tamez and Mrs. Peña outside the car lasting about two minutes.

The conversation between Tamez and Mr. Peña-Gonzalez lasted for roughly three minutes. During that time, according to Tamez, Peña-Gonzalez's carotid artery visibly pulsed, his faced twitched, and his breathing was labored. Ultimately, Peña-Gonzalez agreed to allow Tamez to search the Tahoe. Tamez found dozens of bundles of cash wrapped in black trash bags hidden behind a panel in the back of the car, and he arrested Peña-Gonzalez. A later count of the money revealed 105 bundles containing more than $670,000.

A grand jury indicted Peña-Gonzalez for money laundering and conspiracy to commit money laundering. Peña-Gonzalez moved to suppress the evidence, arguing that reasonable suspicion did not exist to extend the stop after Officer Tamez decided to issue a warning to Mrs. Peña. The district court denied that motion after an evidentiary hearing, but noted that it was a "close call."

Peña-Gonzalez then entered into a conditional plea agreement on the money laundering count, reserving his right to appeal the suppression issue.

No. 14-40126

The presentence report awarded him a two-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1(a). At sentencing, the district court asked the Government whether it was going to move for the additional one-level reduction for timely acceptance under Section 3E1.1(b). The Government said no, citing the suppression hearing.[3] Peña-Gonzalez did not object to the Government's refusal to move for the third level or otherwise mention the issue. The Court sentenced Peña-Gonzalez at the low end of the Guidelines range to 41 months.

Peña-Gonzalez raises two issues on appeal. He argues that the district court should have granted the motion to suppress because Tamez lacked reasonable suspicion to extend the stop. He also contends that he was improperly denied the additional reduction for timely acceptance.

## II.

Peña-Gonzalez concedes that the initial traffic stop was legal, but argues that Officer Tamez impermissibly extended the stop past the time permitted by the Fourth Amendment. The Government agrees that the purpose of the initial stop had been served once the warning issued, but argues that Officer Tamez justifiably extended the stop because reasonable suspicion of other criminal conduct existed by that time. Alternatively, the Government contends that Officer Tamez could continue the stop because Mrs. Peña effectively gave Tamez permission to talk to Peña-Gonzalez.

---

[3] The following exchange took place between the Government's attorney and the district court:

> The Court: All right. Okay. So the third acceptance point, I assume the Government would move for that?
> Mr. Alaniz: No way I'm moving for it, your Honor --
> The Court: Oh, not, because we had the suppression hearing.
> Mr. Alaniz: Yes, sir.
> The Court: All right, so he's at a level 22.

ROA.272–73.

No. 14-40126

## A.

As the Supreme Court recently explained in *Rodriguez v. United States*, the Fourth Amendment limits the permissible length of a traffic stop. *See* 135 S. Ct. 1609, 1614 (2015).[4] "[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop and attend to related safety concerns." *Id.* (citations omitted). This allows the officer to "examine the driver's license and vehicle registration . . . [and] ask about the purpose and itinerary of the driver's trip." *United States v. Fishel*, 467 F.3d 855, 857 (5th Cir. 2006). These "matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009) (internal citation omitted). But once "the tasks tied to the traffic infraction are—or reasonably should [be]—completed," the "[a]uthority for the seizure . . . ends" unless the Government can show an exception to the Fourth Amendment that allows the stop to continue. *See Rodriguez*, 135 S. Ct. at 1614. One oft-invoked exception derives from *Terry v. Ohio*, and it permits elongation of a traffic stop if reasonable suspicion of additional criminal activity emerges (or existed in the first place). *Rodriguez*, 135 S. Ct. at 1614 ("An officer . . . may conduct certain unrelated checks during an otherwise lawful traffic stop. . . . [but] may not do so in a way that prolongs the stop,

---

[4] Prior to *Rodriguez*, some circuits permitted officers to extend the duration of a traffic stop for a short time after accomplishing the objective of the stop, on the grounds that the Fourth Amendment did not protect against such "de minimis" intrusions. *See id.* at 1614. This circuit had never adopted that de minimis exception, which *Rodriguez* rejected, having held long before *Rodriguez* that officers needed reasonable suspicion of other criminal activity to justify a stop extended past the time it took to deal with the traffic violation. *E.g.*, *United States v. Pack*, 612 F.3d 341, 350 (5th Cir. 2010); *United States v. Shabazz*, 993 F.2d 431, 436 (5th Cir. 1993).

No. 14-40126

absent the reasonable suspicion ordinarily demanded to justify detaining an individual.").

Reasonable suspicion exists if the police officer can point to specific and articulable facts indicating that criminal activity is occurring or is about to occur.  *United States v. Alvarado-Zarza*, 782 F.3d 246, 249 (5th Cir. 2015) (citing *Terry v. Ohio*, 392 U.S. 1 (1968)).  The "level of suspicion the standard requires is 'considerably less than proof of wrongdoing by a preponderance of the evidence,' and 'obviously less' than is necessary for probable cause." *Navarette v. California*, 134 S. Ct. 1683, 1687 (2014) (citation omitted).  And the suspicion need not relate to a particular crime; it is sufficient to have reasonable suspicion "that criminal activity may be afoot."  *Pack*, 612 F.3d at 356.  We review the district court's reasonable suspicion finding de novo, looking at the "'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing."  *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).

**B.**

Tamez testified that a number of things he observed and smelled during the course of the stop made him suspicious: the large number of bumper stickers supporting law enforcement, which he contends shows a desire to be viewed as a "good guy" who "can't do no wrong"; numerous air fresheners placed throughout the vehicle, which experience taught him is an attempt to mask the odor of drugs or drug money; Pancho Villa and St. Jude medallions on the key chain, both of which he characterized as icons commonly used by drug smugglers along Highway 77 as symbols for righteousness and protection; and three rosaries hanging from the rearview mirror, which his experience led him to believe are also used by drug traffickers for protection.  Tamez also cited what he perceived as inconsistencies and evasion in Ms. Peña's answers

6

concerning where they lived, how long they spent in Houston, where they stayed, and what they did at the car auction.

Peña-Gonzalez counters that the stickers, religious symbols, and air fresheners are all consistent with innocent behavior and therefore cannot constitute reasonable suspicion of criminal wrongdoing.  He also argues that the answers Ms. Pena gave were not inconsistent and not a basis for further detention.

We do have concerns that classifying pro-law enforcement and anti-drug stickers or certain religious imagery as indicators of criminal activity risks putting drivers "in a classic 'heads I win, tails you lose' position."  *See United States v. Escamilla*, 560 F.2d 1229, 1233 (5th Cir. 1977); *see also United States v. Townsend*, 305 F.3d 537, 544 (6th Cir. 2002) (holding that, despite the officer's assertion that "the presence of a Bible in the car was suspicious because drug couriers often display religious symbols to deflect suspicion of illegal activity," the Bible "is a very weak indicator of criminal activity"); *cf. Estep v. Dallas Cnty., Tex.*, 310 F.3d 353, 358–59 (5th Cir. 2002) (holding that an NRA sticker on a car should not have been considered in assessing the reasonableness of the officer's suspicion that the driver was dangerous).  But we need not decide whether these items alone, or in combination with one another, amount to reasonable suspicion because we find the more suspicious evidence to be the array of air fresheners and inconsistencies in the driver's responses to the officer's basic questions.

We have long recognized that the presence of air fresheners, let alone four of them placed throughout an SUV, suggests a desire to mask the odor of contraband.  *See, e.g.*, *United States v. Rivera*, 595 F.2d 1095, 1099 (5th Cir. 1979) (holding that "observation of . . . air freshener . . . strengthened the probable cause to search the [vehicle], in light of his knowledge and experience that drug traffickers often use air fresheners . . . to disguise the smell of

marijuana"); *United States v. Quiroz-Hernandez*, 48 F.3d 858, 864 (5th Cir. 1995) (holding that "a strong odor of fabric softener while walking to [a] van" supported a finding of probable cause); *see also United States v. Ortega*, 478 F. App'x 871, 873 (5th Cir. 2012) (noting that the officer found an oversized air freshener suspicious); *United States v. Cantu*, 426 F. App'x 253, 255 (5th Cir. 2011) (noting that the officer found six air fresheners suspicious); *United States v. Frias*, 451 F. App'x 371, 372 (5th Cir. 2011) (holding that multiple air fresheners provided evidence of guilt); *United States v. Aguirre*, 29 F.3d 624, 1994 WL 395034, at *1 (5th Cir. 1994) (affirming based on an "uncommonly strong odor of air freshener"). Peña-Gonzalez cites to another court's observation that occupants of a car may simply have liked the smell of air freshener. *See United States v. Guerrero*, 374 F.3d 584, 589–91 (8th Cir. 2004) (holding that air fresheners do not create reasonable suspicion). But "[a] determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct," *Arvizu*, 534 U.S. at 277, and here the multiple air fresheners in the Tahoe emitted an "overwhelming odor" of "dryer sheets"[5] that was likely not pleasant to the occupants during the long ride from Houston to Palmview. Reasonable suspicion determinations are highly factbound and the number and placement of the fresheners, along with Tamez's description of the strong odor and the location of this stop along a drug corridor close to the border, all distinguish this case from *Guerrero*. *See Pack*, 612 F.3d at 362 (taking account of "the large volume of contraband that is moved along our major highways on a daily basis, especially in border states like Texas").

Mrs. Peña's demeanor and inconsistent statements, during a conversation that took place in her native language of Spanish, are also part

---

[5] Tamez later discovered that the overwhelming odor came from actual dryer sheets that Peña-Gonzalez used in an effort to conceal the bundles of cash.

of the overall circumstances that demonstrate the reasonableness of Tamez's suspicion that criminal activity was afoot.[6]  Inconsistent stories, especially when combined with other facts, can give rise to reasonable suspicion.  *Pack*, 612 F.3d at 358.  Here, Mrs. Peña paused for about four seconds when asked the basic question of how long she spent in Houston.  She switched her answer with regard to whether her husband had purchased a car at an auction.  She went from saying that they had just spent one day in Houston to saying that they had spent two nights there.  And she said she lived in a place other than that listed on her insurance.  Again, all of these may well have innocent explanations: Palmview is indeed a town that borders Mission, and perhaps they had spent so much time driving that they really did only spend a day in Houston despite staying two nights there.  But the question is whether it was reasonable for someone in Tamez's shoes to view the answers as suspicious, not whether they are convincing proof that Mrs. Peña was lying.  *See Fishel*, 467 F.3d at 857 (holding that inconsistencies in a person's story gave rise to reasonable suspicion); *United States v. Jones*, 185 F.3d 459, 464 (5th Cir. 1999) (noting that a person's own conflicting statements to law enforcement are probative of guilty knowledge).

In sum, Officer Tamez had reasonable suspicion of criminal activity apart from the traffic violation to continue the stop for the relatively short additional three-minute time period during which he obtained consent to search the Tahoe.  *See United States v. Place,* 462 U.S. 696, 709 (1983) (holding

---

[6] The district court did not rely on Mrs. Peña's statements in its ruling, focusing instead only on the stickers, air fresheners, and symbols that Tamez observed.  We may, however, consider them because Tamez's testimony on these points was not impeached and a video captured the encounter. *See Pack*, 612 F.3d at 347 (noting, in conducting a reasonable suspicion inquiry, that "[w]e may affirm the district court's decision on any basis established by the record") (citing *United States v. Ibarra-Sanchez*, 199 F.3d 753, 758 (5th Cir. 1999) (holding that "[t]o the extent the underlying facts are undisputed . . . we may resolve questions such as probable cause and reasonable suspicion as questions of law")).

that "the brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion"); *see also Pack*, 612 F.3d at 362 (holding "a delay of only eight minutes" was reasonable "[i]n view of the suspicious facts that [the officer] had observed"). The district court therefore properly denied Peña-Gonzalez's motion to suppress.

### III.

We next address Peña-Gonzalez's argument that the Government denied him the third level for timely acceptance of responsibility based on what he contends is an impermissible consideration: his filing of a motion to suppress. Section 3E1.1(b) reduces the offense level by 1

> upon motion of the government stating that the defendant has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently[.]

Peña-Gonzalez never objected to the presentence report or the sentence for failing to include this reduction. He nonetheless argues that potential error was preserved because the district court raised this issue *sua sponte* by asking the Government if it planned to move for the third level. But that is a common question asked by district judges that in no way questions the propriety of the Government's decision not to award the reduction. The district court never heard argument on the issue now being raised, found any facts relevant to the question, or ruled on whether filing a motion to suppress is a valid basis for withholding the additional level. Accordingly, we review only for plain error. *See United States v. Chavez-Hernandez*, 671 F.3d 494, 497 (5th Cir. 2012) ("If, however, the defendant has failed to make his objection to the guidelines

calculation sufficiently clear, the issue is considered forfeited, and we review only for plain error.").

Citing a recent Sentencing Commission amendment to the application notes of Section 3E1.1(b) and cases from other circuits, Peña-Gonzalez contends that a Section 3E1.1(b) reduction is required so long as the defendant pleads guilty before trial. But the amendment that Peña-Gonzalez refers specifically only to waivers of appeal:

> The government should not withhold such a motion based on interests not identified in § 3E1.1, such as whether the defendant agrees to waive his or her right to appeal.

U.S.S.G. § 3E1.1 app. n.6 (2013). It is unclear to what extent this was meant to reject our previous rule that a suppression hearing may justify withholding a Section 3E1.1(b) reduction. *See United States v. Gonzalez*, 19 F.3d 982 (5th Cir. 1994) (reasoning that a suppression hearing can be "in effect the substantive equivalent of a full trial, which required full participation by the Government and allocation of the court's resources"). The Government argues that a suppression hearing implicates the interests identified in the Guideline concerning "preparing for trial" and "permitting the government and the court to allocate their resources efficiently." U.S.S.G. § 3E1.1

A circuit split exists on the issue, and no circuits have addressed the issue since the amendment. *Compare United States v. Rogers*, 129 F.3d 76, 80 (2d Cir. 1997) (applying the same rule as the Fifth Circuit), *with United States v. Price*, 409 F.3d 436, 443–44 (D.C. Cir. 2005) (reaching the opposite conclusion), *United States v. Marquez*, 337 F.3d 1203, 1212 (10th Cir. 2003) (same), *and United States v. Kimple*, 27 F.3d 1409, 1414–15 (9th Cir. 1994) (same). Lacking authority for his position in this circuit, reinforced by the existence of a split in other circuits, Peña-Gonzalez cannot show any error that was plain or obvious. *See United States v. Segura*, 747 F.3d 323, 330 (5th Cir.

2014) ("[Defendant] cites no Fifth Circuit authority that would make the district court's error clear or obvious.  Therefore, he fails to satisfy the second prong of our clear error analysis.").

*     *     *

The judgment is AFFIRMED.