# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 18-30902

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

ROBERT TREMAINE WILLIAMS,

Defendant - Appellant

United States Court of Appeals
Fifth Circuit

**FILED**
August 27, 2019

Lyle W. Cayce
Clerk

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 2:17-CR-122

Before KING, HIGGINSON, and DUNCAN, Circuit Judges.

STEPHEN A. HIGGINSON, Circuit Judge:*

Robert Tremaine Williams, challenging his conviction for possession of cocaine with intent to distribute, argues that the district court should have suppressed evidence obtained by a Louisiana police officer during a highway stop. Williams also challenges his sentence, 96 months, as substantively unreasonable. We affirm.

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 18-30902

I

An indictment filed in May 2017 charged Williams with possessing 500 grams or more of cocaine with intent to distribute, in violation of 21 U.S.C. § 841. The charge arose from a traffic stop along Interstate 10 near Lake Charles, Louisiana on September 9, 2014. Williams moved to suppress the cocaine found during that traffic stop, leading to an evidentiary hearing before a U.S. magistrate judge.

At the suppression hearing, the Government presented the testimony of Chad Booth, an officer of the Lake Charles Police Department and a member of an anti-drug task force operating in Calcasieu Parish, Louisiana. Booth testified that on the morning of September 9, 2014, he had parked his marked canine unit near mile marker 35 on I-10, facing the eastbound lanes. At 5:57 AM, he observed a tan Grand Marquis traveling in the left lane, side by side with a tractor trailer. Booth said his visibility was roughly a mile despite the early-morning darkness thanks to lights on the interstate. This permitted him to observe the vehicle traveling next to the tractor trailer for "[a]pproximately half a mile" without passing it. After the Grand Marquis and tractor trailer passed, Booth followed, acting on a Louisiana statute that prohibits travel in the left lane, subject to certain exceptions, like passing. *See* LA. REV. STAT. § 32:71(B)(1)(a).

Catching up to the Grand Marquis, which had remained in the left lane without passing the tractor trailer, Booth did not yet switch on his lights or siren. Instead, he "applied pressure" by driving "very close" to the rear of the vehicle. The Grand Marquis then sped up, passed the tractor trailer, and moved out of the passing lane, at which point Booth turned on his lights and pulled it over.

Williams was the vehicle's driver and only occupant. Booth approached on the passenger side and asked Williams for his driver's license. At this point,

2

No. 18-30902

Booth observed that Williams's hands were shaky and sweaty and that sweat was forming on the bridge of his nose, despite the car's air conditioning. Booth inferred Williams was "extremely nervous." Booth also asked Williams about his origin and destination. Williams evidently said he had interviewed at "a refinery in Beaumont[, Texas] for a scaffolding job" but did not identify the company. During this questioning, Booth saw that Williams's "carotid artery began to pulsate visibly," and he observed Williams pausing before answering, sensing that Williams was hesitant to speak. Booth then took Williams's driver's license to run a computer check. Just before leaving, he told Williams that "if everything comes back . . . valid then I'll just give [you] a warning."

While Booth was running the computer check, a second officer, Kevin Hoover, arrived. According to Booth, Hoover had heard about the stop over the radio and decided to help. The check came back clean, and Booth asked Williams to get out of his vehicle and sign a "notice of violation," a written warning. Booth then returned Williams's driver's license.

Despite the earlier promise, Booth did not now tell Williams he could go. Instead, Booth asked Williams "if he would agree to speak with me some more," and Williams did. Noting Williams's continued signs of nervousness, Booth resumed questioning, with Hoover standing nearby. Booth asked Williams for the name of the company where he had interviewed, and this time, Williams answered that it was Chevron. Booth judged this an inconsistency, because Williams had not said the company name earlier.[1] Booth also discerned an inconsistency when Williams explained his destination. Williams had said at some point earlier that he was unemployed. Now, during this second round of questioning, Williams said that he had to get home to Alabama "to make some

---

[1] It is not clear from the record whether Booth had asked Williams specifically for the company name during the first round of questioning.

3

money" and to get back to his children. Booth viewed this as inconsistent with being unemployed.

By this time, Booth suspected criminal conduct and intended to search Williams's vehicle, though he kept his suspicion and intent to himself. Instead, he showed Williams a "search and seizure form" used by the drug task force, but Williams refused to let Booth search his vehicle.[2] Notwithstanding Williams's refusal, Booth returned to his unit to get his drug dog. While being walked around Williams's vehicle, the dog alerted next to the trunk. Booth's search of the trunk turned up 2.5 pounds of cocaine.

Following the hearing, the magistrate judge issued a report and recommendation in which she concluded that Booth's initial stop was justified under the Louisiana statute restricting travel in the left lane. The magistrate judge also concluded that the stop was "converted into a consensual encounter" after Booth returned Williams's driver's license and completed issuing Williams a warning. The magistrate judge explained that a reasonable person would have felt free to leave under the circumstances.

Over Williams's objections, the district court adopted the magistrate judge's report and recommendations in full, adding no reasoning of its own. Williams agreed to a conditional guilty plea, retaining his right to appeal the denial of his motion to suppress. The district court then sentenced Williams to 96 months' imprisonment, the upper bound of the guideline range produced by Williams's pre-sentence report (PSR).[3] Williams timely appealed.

---

[2] Booth read the form to Williams after Williams explained that he could not read.

[3] Williams's guideline range was 77 to 96 months, the product of an offense level of 21 and a category VI criminal history.

No. 18-30902

## II

In considering motions to suppress, we review the district court's factual findings for clear error and its conclusions of law de novo. *United States v. Contreras*, 905 F.3d 853, 857 (5th Cir. 2018). We will uphold the denial of a motion to suppress "if there is any reasonable view of the evidence to support it." *Id.* (quoting *United States v. Michelletti*, 13 F.3d 838, 841 (5th Cir. 1994) (en banc)). We view all evidence in the light most favorable to the prevailing party below. *Id.*

## III

## A

A traffic stop is a seizure under the Fourth Amendment. *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004) (en banc). We examine the legality of a traffic stop under the two-pronged inquiry of *Terry v. Ohio*, 392 U.S. 1 (1968). *See Brigham*, 382 F.3d at 506. "[We] first examine whether the officer's action was justified at its inception, and then inquire whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop." *Id.*

Officer Booth justified stopping Williams under Louisiana's law that "[u]pon all multilane highways, no vehicle shall be driven in the left-hand lane except when . . . overtaking or passing another vehicle proceeding in the same direction," among certain other circumstances. *See* LA. REV. STAT. § 32:71(B)(1)(a).[4] Williams contends that, from Booth's vantage point, he "could not have observed Mr. Williams's vehicle for long enough to form a reasonable

---

[4] We may doubt that Booth, a member of a drug task force, was interested principally in keeping the left lane of I-10 free-flowing, but "the constitutional reasonableness of the stop does not depend upon the actual motivations of the officer involved." *United States v. Sanchez-Pena*, 336 F.3d 431, 437 (5th Cir. 2003) (citing *Whren v. United States*, 517 U.S. 806, 813 (1996)).

suspicion that a violation of [the statute] had occurred." Williams adds that he in fact did pass the adjoining tractor trailer before Booth pulled him over, so he actually complied with the statute.

To justify a stop, an officer's view that a driver has violated the law need not be strictly correct, but it must be "objectively reasonable." *United States v. Henry*, 853 F.3d 754, 757 (5th Cir. 2017). Williams's argument is not without force, because the Louisiana statute does not specify a time or distance that a car must remain in the left-hand lane before a violation occurs. To gauge the reasonableness of an officer's interpretation of state law, we may look to the judicial decisions of that state. *See id.* at 757–58. A violation of § 32:71(B)(1)(a) is not established merely by a vehicle being momentarily in the left-hand lane. *See Sons v. Commercial Union Assur. Cos.*, 433 So. 2d 842, 845–46 (La. Ct. App. 1983). But the Louisiana Court of Appeal has found a stop justified under § 32:71(B)(1)(a) when an officer testified that he saw the vehicle travel "a good half mile" before moving over to the side. *See State v. Lewis*, 980 So. 2d 251, 255 (La. Ct. App. 2008).[5] Under these interpretations of the statute, Booth's testimony that he watched Williams in the left-hand lane for approximately half a mile is an objectively reasonable justification for the initial stop.

To avoid suppression of the evidence, Booth's subsequent actions must have been "reasonably related in scope to the circumstances that justified the stop." *Brigham*, 382 F.3d at 506 (citing *Terry*, 392 U.S. at 19–20). Booth's initial questioning and computer check of Williams are well within that scope. *See id.* at 506–08. But detention resulting from a traffic stop "must be temporary and last no longer than is necessary to effectuate the purpose of the stop, unless

---

[5] Similarly, we have upheld a stop by an officer who observed a driver in the left-hand lane for "ample time" but did not specify a distance. *See United States v. Landaverde-Castillo*, 731 F. App'x 293, 297 (5th Cir. 2018).

further reasonable suspicion, supported by articulable facts, emerges." *Id.* at 507.

The Supreme Court recently clarified the law governing officers' actions that broaden their investigation and extend detention beyond the scope of the initial stop. An officer's "ordinary inquiries incident to the traffic stop" include those that Booth carried out: checking the driver's license, looking for outstanding warrants, or inspecting the vehicle's registration. *Rodriguez v. United States*, 135 S. Ct. 1609, 1615 (2015) (quotation omitted). "A dog sniff, by contrast, is a measure aimed at detecting evidence of ordinary criminal wrongdoing." *Id.* (quotation omitted). "[A] dog sniff, unlike the routine measures just mentioned, is not an ordinary incident of a traffic stop." *Id.*

The magistrate judge upheld the dog sniff and the extension of Williams's detention that it entailed on the ground that the stop had evolved into a consensual encounter. *See Brigham*, 382 F.3d at 508 ("[A] consensual interrogation may follow the end of a valid traffic stop and . . . such consensual encounters do not implicate Fourth Amendment concerns."). Once Williams signed the notice of violation, Booth returned his driver's license and was not physically restraining him or accusing him criminal conduct. Thus, the magistrate judge concluded that a reasonable person would have felt free to leave. *See United States v. Drayton*, 536 U.S. 194, 201 (2002) ("If a reasonable person would feel free to terminate the encounter [with law enforcement], then he or she has not been seized [within the meaning of the Fourth Amendment].").

Williams disputes this conclusion. He points out that Booth had not kept his initial promise to let him go if the computer check of his license was clean. Williams also notes that Booth had asked him to get out of his vehicle. This left Williams "flanked by" the two officers on the side of the interstate, with a

7

drug dog waiting in the wings and Booth asking Williams if he would keep talking.

Under these circumstances, the officers did bring a measure of coercion to bear on Williams, compared, for instance, to a traffic stop carried out by a single officer who permitted Williams to remain in his car. But we have frequently ruled that drivers should have felt free to leave, or that they gave valid consent to questioning or a search, under circumstances at least as coercive as these. *See, e.g.*, *United States v. Perales*, 886 F.3d 542, 547–48 (5th Cir. 2018); *Carney v. Brandon Police Dep't*, 624 F. App'x 199, 200–02 (5th Cir. 2015); *United States v. Zambrano*, 325 F. App'x 369, 371 (5th Cir. 2009); *United States v. Gurrola*, 301 F. App'x 337, 341–42 (5th Cir. 2008); *United States v. Mendieta-Garza*, 254 F. App'x 307, 313–14 (5th Cir. 2007). Moreover, when we have found a seizure or concluded that consent was invalid, officers took some coercive step beyond what the officers did here. *See, e.g.*, *United States v. Santiago*, 310 F.3d 336, 343 (5th Cir. 2002) (deeming consent invalid where the officer retained the driver's documents and insinuated the driver was involved in criminal activity); *United States v. Jones*, 234 F.3d 234, 243 (5th Cir. 2000) (same, where officers retained the driver's documents and kept him in the back of the patrol unit). Accordingly, consistent with our caselaw, we conclude that Williams was no longer seized at the moment Booth returned his driver's license and asked if he would keep talking.

That conclusion goes only so far, however. After Booth's second round of questioning, he asked Williams for consent to search, and at this point, Williams refused. Booth then told Williams that he would conduct a dog sniff. In the process, Booth went beyond the "ordinary inquiries" incidental to a traffic stop. *Rodriguez*, 135 S. Ct. at 1615. Contrary to the magistrate judge's ruling, Williams did not consent to this. Consequently, Booth must have had

"the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.*

At the evidentiary hearing, the Government presented argument on Booth's suspicions to the magistrate judge, but the magistrate judge declined to consider it, resting her ruling instead on Williams's consent. Despite that, we may affirm the lower court's ruling on a motion to suppress based on any rationale raised below and supported by the record. *United States v. Wallace*, 885 F.3d 806, 809 (5th Cir. 2018) (quotation omitted). We therefore consider whether Booth had reasonable suspicion to justify the continued detention of Williams.

Reasonable suspicion must be supported by "specific and articulable facts." *United States v. Alvarado-Zarza*, 782 F.3d 246, 249 (5th Cir. 2015) (quoting *Terry*, 392 U.S. at 21). "Although a mere hunch does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Navarette v. California*, 572 U.S. 393, 397 (2014) (quotations omitted).

At the evidentiary hearing, the Government emphasized the signs of Williams's nervousness that Booth observed: the shaking hands, the perspiration, and the active carotid artery. The Government also relied on the apparent inconsistencies in Williams's answers between the initial and later rounds of questioning. On appeal, the Government reiterates these facts, adding Williams's repeated pauses before answering questions as another form of suspicious behavior. The Government also points to Williams's travel along I-10 from Texas, describing that state and that highway as "a destination and route well-known for drug trafficking."

It may be that some of Booth's observations, taken alone, are "readily susceptible to an innocent explanation," but we are to train our review of

No. 18-30902

reasonable suspicion on the totality of the circumstances. *See United States v. Arvizu*, 534 U.S. 266, 274–75 (2002). We have repeatedly ruled that signs of nervousness and inconsistent or implausible answers to questions can support reasonable suspicion. *See, e.g., United States v. Pack*, 612 F.3d 341, 361–62 (5th Cir. 2010); *United States v. Pena-Gonzalez*, 618 F. App'x 195, 199–200 (5th Cir. 2015); *United States v. Fajardo-Guevara*, 507 F. App'x 365, 367–68 (5th Cir. 2014); *United States v. Stilley*, 191 F. App'x 284, 285 (5th Cir. 2006). We have also ruled that a driver's location may be significant, though it may be less compelling in some cases than in others. *Compare Pack*, 612 F.3d at 345, 362 (finding travel along I-30 significant), *with United States v. Gonzalez*, 328 F.3d 755, 757–58 (5th Cir. 2003) (finding travel along I-20 significant because it was hundreds of miles from the most efficient route to the driver's claimed destination).

In light of our caselaw, the relatively low proof required for reasonable suspicion, and the standard of review favoring the prevailing party below, we conclude that the Government met its burden. Reasonable suspicion supported continuing to detain Williams so Booth could conduct the dog sniff. The dog's alert, in turn, furnished probable cause to search the vehicle. *See United States v. Ned*, 637 F.3d 562, 567–68 (5th Cir. 2011). Accordingly, we affirm the denial of Williams's motion to suppress.

B

Williams also challenges his 96-month sentence as substantively unreasonable in light of the factors codified at 18 U.S.C. § 3553(a). We review the substantive reasonableness of a sentence for abuse of discretion. *Gall v. United States*, 552 U.S. 38, 51 (2007). A sentence within the guideline range promulgated by the U.S. Sentencing Commission enjoys "a presumption of reasonableness." *United States v. Scott*, 654 F.3d 552, 555 (5th Cir. 2011). Rebuttal of that presumption requires a showing that the court (1) failed to

10

consider a factor it should have considered, (2) gave significant weight to an improper or irrelevant factor, or (3) clearly erred in balancing the factors. *United States v. Ayelotan*, 917 F.3d 394, 409 (5th Cir. 2019).

Williams's guideline range was 77 to 96 months, and he did not object to the calculation yielding that range. At the sentencing hearing, counsel for Williams urged a sentence of 77 months, identifying the same mitigating considerations that Williams now presses on appeal: a letter from his pastor attesting to his behavior as a father and husband; the family "support system" that would help him after release from prison; and substance abuse motivating his criminal conduct. The Government responded there and responds now by emphasizing Williams's "substantial criminal history," which placed him in Category VI under the Sentencing Guidelines. After arguments from counsel, the district court reviewed the § 3553(a) factors, noting "the need to avoid unwarranted sentencing disparities among defendants with similar records found guilty of similar conduct" as "a particularly relevant one in this case." Seeing "no need to depart from the guidelines," the court chose the upper bound.

The record shows that the district court heard the same considerations that Williams urges to us. Williams's appeal is thus a request to weigh the balance of those sentencing factors again, but no argument from Williams shows us clear error in the balance the district court struck. Consequently, we presume the sentence reasonable, and we affirm.


IV

For the foregoing reasons, the judgment of the district court is AFFIRMED.